JOHN V. O'HARA et al.

*v.*

RICHARD J. NELSON et al.

[Decided February 19th, 1906.]

The storing and using of gasoline in large quantities in a frame build-
ing, used as an automobile garage, situate in a thickly built-up portion
of a large city, where there are numerous frame buildings, and where an
explosion would cause serious injury to the adjacent property, and
would be a serious menace to the lives of those in that vicinity, consti-
tutes a nuisance which will be enjoined so far as to restrain the intro-
duction of gasoline into the tanks of the automobiles while inside the
building and the storing of automobiles with gasoline in their tanks.

This is an application for a preliminary injunction to restrain
the defendants from operating an automobile garage because of
the noise, odor and danger arising therefrom.

The complainants are John V. O'Hara and Catharine O'Hara,
and the appearing defendants are Richard J. Nelson and James
Ray, and they will herein be called the defendants. The com-
plainants are owners in common of a house and lot fronting on
Cottage street, in Jersey City, and the defendants are the tenants
of a recently erected building fronting upon the boulevard in
the same city, which building is in use as an automobile garage.
The land on which the garage is erected is owned by a Mrs.
Childs. The building was commenced some time in the middle
of October, 1905, and was opened for business about the 20th of
November, 1905. About the 5th of November this bill was filed.

The application for a preliminary injunction was based upon
the bill and affidavits, and was met by affidavits on behalf of the
defendants, to which rebutting affidavits were filed by the com-
plainants.

The statements by the witnesses in their affidavits were so con-
flicting that counsel for each side requested the court to take the
testimony of the witnesses in open court, which was done.

11

Mrs. Childs, although she is a party defendant and filed an affidavit in her own behalf, did' not appear by counsel at the hearing.

The testimony of a large number of witnesses was taken. The facts I find as follows:

Mr. and Mrs. O'Hara, the complainants, own a property, twenty-five feet in front, on Cottage street, extending between parallel lines one hundred and twenty-five feet in depth. On this property there is erected a frame building three stories in height. The ground floor is occupied by the O'Haras, the family consisting of the father, mother and a seventeen-year-old daughter. The second and third floors are occupied by a tenant or tenants whose names are not given by any of the witnesses. The building extends back from Cottage street between forty and forty-five feet.

The automobile garage of the defendants is erected on a lot about forty or fifty feet from the corner of Cottage street and the boulevard, and faces on the boulevard. It is about forty feet front by about seventy-five feet deep. It is of frame upon a brick foundation. The rear wall of the garage for about ten feet runs parallel and adjacent to the house of the complainants, and about four to five feet therefrom. The immediate neighborhood, as disclosed by the proofs, is shown to be as follows: On the corner of Cottage street and the boulevard there is a one-story frame building used as a candy store and ice cream parlor, occupied by a man named Patterson. A few feet intervene between this building and the automobile garage. Next to the garage, separated by a few feet from it, is a two-story-and-basement house, occupied by Mrs. Albrecht, who keeps therein a boarding and lodging-house. Next to her house is a similar house, containing one other story, which is occupied by Mrs. Childs, who owns the land upon which that is erected, and also the land upon which the Albrecht boarding-house, the automobile garage and the Patterson store are erected. Next to Mrs. Childs, on the boulevard, is a real estate office, and next to that, and upon the corner of the boulevard and West Newark avenue, is a liquor saloon.

Coming back now to the corner of Cottage street and the

boulevard, immediately in the rear of Patterson's ice cream saloon, but several feet therefrom, is the property line of the complainants, and on their property is erected the house heretofore described. Next to the complainants' property there are vacant lots until the corner of the next street is reached, and upon that corner there is a five-story brick flat building erected. Across Cottage street the land is fenced in and is owned by a railroad company, and trains are there operated.

The garage, as before stated, is forty feet in front and seventy-five feet deep. It has a capacity of between twenty and twenty-five automobiles of average size. The rear of the building is used as a shop for the repairing of automobiles and of bicycles, so that at present there are no automobiles stored nearer than thirty feet from the rear wall. There is a large door in the front of the building, and there are five windows in each side wall, one window in the rear wall, and three openings in the roof in the form of skylights. Upon the right, as you enter the garage, is a small office, and upon the left is a large cement floor, twelve by fifteen feet, where there is a washstand for cleaning the cars. Outside of the building, as you enter, there is buried in the earth some three feet a reservoir or tank of sheet iron capable of holding two barrels of liquid. This tank has two openings, in one of which there is a pipe leading into the barrel through which it is filled, and the other has a pipe leading out of the tank and connecting with a pump, by which it is emptied. Attached to this last-named pipe there is what is known as a "Bowser pump," which is specially designed for the pumping of gasoline, and is so constructed that it cannot, at any one time, bring up more than a gallon of gasoline. Of course, by setting the gauge at less than a gallon a less amount can be brought up at each complete operation of the pump. The purpose of limiting the amount which may be brought up at any one time is to minimize the chance of more gasoline than is needed being taken from the receptacle.

The method of filling the tanks of the automobiles from the buried reservoir is to pump up the gasoline and gather it in a receptacle, which is in turn emptied into the tank of the auto-

mobile, which tank, when filled, or when as much as is intended is put into it, is closed by screwing down a cap.

*Mr. J. Merritt Lane,* for the complainants.

*Mr. George J. Stillman* and *Mr. Arthur B. Archibald,* for the defendants.

GARRISON, V. C. (after stating facts).

There are three distinct elements charged by the complainants as constituting the nuisance complained of. They complain of noise, of odor and of danger.

The evidence with respect to noise is so slight and the noises complained of were so casual and ordinary in their nature that I shall entirely dismiss this charge from consideration.

With respect to the charge of the emanation of disagreeable odors, I find the situation to be this: Mr. and Mrs. O'Hara, and their daughter, each testify that at various times they smelled the odor of gasoline coming from the direction of the garage. Opposed to this testimony there is that of Patterson, whose store is immediately next to the garage; of Mrs. Albrecht, her domestic servant and a boarder and lodger in her house, which house, as has been before stated, is immediately next upon the other side of the garage; of Mrs. Childs and her daughter, who reside immediately next to Mrs. Albrecht, and of a Mr. Smith, who lives across the boulevard from the garage.

The complainants seek to minimize the weight to be given to the testimony of Patterson, Mrs. Albrecht, her servant and her lodger, and Mrs. Childs and her daughter, by charging that the latter are, of course, directly interested, Mrs. Childs being the owner of the land in question and Mrs. Albrecht being interested because she is a tenant of Mrs. Childs, as also is Mr. Patterson; that the domestic servant testified that she did not know the odor of gasoline, and that the boarder in Mrs. Albrecht's house lived in a room too high above the surface of the ground to readily detect the odor, if it existed. It must be kept in mind, however, that Mrs. Albrecht, her servant and her lodger, each testified that they were frequently in the yard of her house,

which is immediately next the garage, upon which yard, or adjacent to it, there opened five windows of the garage, and that each testified that they had never detected the odor of gasoline in the air.

Conceding that the criticism of the complainants in this respect is substantial, it is equally applicable to the complainants' own evidence, which consists solely of the testimony of Mr. and Mrs. O'Hara, the complainants, and their daughter. If this odor was as prevalent as they would have us believe, it seems very strange that they have not produced any of the other occupants of their own house to testify to the existence of the odor, and that they have not produced any impartial witness thereto. If these complainants seriously intended to rest their right to the writ of injunction upon the proof of the presence in the atmosphere surrounding their house of odors emanating from the garage, they surely would have produced witnesses, unaffected by interest or bias, whose testimony would have been practically impregnable. If these odors are of the character they describe, they could have produced overwhelming evidence thereof by causing their premises to be visited by persons whose testimony would have carried conviction.

I find, therefore, as a fact, that the complainants have not produced sufficient evidence of the existence of odors emanating from the garage to entitle them, upon this preliminary application, to the relief prayed for.

This leaves for consideration that which I consider to be the serious question in this case. Briefly stated, that is whether, in a thickly built-up portion of a large city—particularly where there are numerous frame buildings—parties may store and use so dangerous a substance as gasoline in such large quantities that an explosion thereof would cause serious injury to the adjacent property and be a serious menace to the lives of those in that vicinity.

The expert testimony adduced is fortunately not conflicting, and may, in fact, be said to be accordant. This testimony shows that what is commonly termed "gasoline" is the fourth distillate of crude petroleum. This fourth distillate consists of what is termed "Naphtha," which, in turn, is subdivided into "Naphtha,

A B and C," and gasoline is the common term applied to "Naphtha C." It is so readily inflammable that it can scarcely be said to have any "flash point." Flame coming in contact with it will almost inevitably and invariably ignite it without any appreciable period of previous heat.

If gasoline is brought in contact with flame, when the gasoline is unconfined within narrow limits, it will ignite without exploding. But if the gasoline is confined, and has been vaporized by coming in contact with the air, a gas or vapor is formed, which, when ignited, explodes with all of the incidents connected with the most disastrous character of explosion. One of the witnesses gave an instance of the explosion of a barrel of gasoline on the basement floor of a five-story building which completely wrecked the building, blowing off its roof and killing five persons. Gasoline vaporizes almost instantly upon coming in contact with oxygen. So that, in common use, as soon as gasoline is exposed to the air some of it, at least, always goes off in the form of vapor, which vapor, being heavier than the air, tends to sink. The gravest source of danger with respect to handling gasoline is that since this vapor sinks it is not readily perceptible to one standing upright in a room, because it is along the lower levels and close to the floor, and if it is not agitated by the atmosphere so as to dissipate and blow away out of the room, is likely to be ignited by coming in contact with flame, the ignition causing an explosion, which, as before stated, is of sufficient force to cause great damage. This vapor, unless dispelled by a current of air and dissipated, is likely to travel considerable distance through a building, and will almost inevitably ignite and explode upon coming in contact with any flame.

It will be seen, therefore, that by burying in the earth the receptacle containing the gasoline but little progress has been made toward safety in the use of gasoline in any building. So soon as the gasoline is introduced inside of the building and is uncovered to the air vaporization immediately takes place, and this vapor is the ever-present source of danger.

When gasoline has been placed in the tank of an automobile and the automobile is stored in a building, a slight leak from the tank would immediately cause vapor to form, having the

characteristics just dealt with. It will thus be perceived, in the case in hand, that the source of danger is that gasoline is constantly being handled and stored in this building, and that inevitably some of it will become vapor and this will be an ever-present menace.

It cannot, of course, be said that gasoline cannot be handled so as not to cause an explosion, because it is shown to be the scientific fact that if the vapor is blown out of the building by a current of air, then there would be nothing present to explode; and it is also, of course, true that if no flame is ever brought in contact with the vapor its presence would be harmless. But this is too narrow a margin of safety upon which to predicate a finding that the danger is not actually imminent. It seems certain that the presence of some flame in this building at some time must be presupposed, and it also seems certain that in the habitual handling of this fluid, which immediately gives off vapor when brought in contact with air, there will gather from time to time in this building this dangerous vapor, which will not always be promptly ejected by currents of air.

It will be borne in mind that, even with the seven machines now being stored in the building, an explosion which set fire to the building would inevitably cause an explosion of those seven tanks, provided they contained gasoline, which they almost inevitably would; and it is to be supposed that this garage will at some time in the future, if not in the very near future, secure more automobiles on storage, probably up to its limit of twenty or twenty-five.

The real question, therefore, seems to be whether the storage and use of so dangerous a substance in the midst of such surroundings is a nuisance. The initial inquiry, of course, is what one may do upon his own land without restraint at the instance of his neighbors. The house of lords, in the case of *Fletcher* v. *Rylands, L. R. 3 H. L. 330; 1 Eng. Rul. Cas. 236,* laid down the rule that one who brought anything upon his own land which would be harmful to his neighbors if it escaped would be liable in the event of escape, even though no negligence were proven. This doctrine, in that case, was applied to the bursting of a reservoir holding water.

This doctrine has been modified in England, and while it has been adopted in some of the courts of our sister states, it has been modified or repudiated in others. Notes to *1 Eng. Rul. Cas. 266 et seq.*

When the doctrine required consideration in this state, Chief-Justice Beasley, in *Marshall* v. *Welwood, 38 N. J. Law (9 Vr.) 339 (1876)*, with his customary acumen, indicated the fallacy of the reasoning adopted in the cited case. He pointed out that the gathering of water in a reservoir upon one's own land or premises was not *per se* a nuisance, and that therefore the land-owner should not be held liable for the escape of the water unless it was due to his negligence. He held, similarly, that the operation of a steam boiler upon one's own land was not *per se* a nuisance.

The maintenance in its vigor of the doctrine of *Fletcher* v. *Rylands, supra*, would have practically stopped all progress. In the case of *Brown* v. *Collins, 53 N. H. 442; 16 Am. Rep. 372*, cited in *1 Eng. Rul. Cas. 274*, the court shows that everything that a man can bring on his land is capable of escaping in some form and of doing damage after its escape.

It is necessary, therefore, for the courts to so administer the law as to meet the changing conditions of the times and to adapt it to existing conditions. Since the rights of every dweller in a community are relative and must be determined with respect to the interests of the entire body, the courts necessarily, in each case, weigh the opposing interests and endeavor to arrive at a rule which will not conflict with the interests of the larger number, while it preserves, to the extent that it is reasonable, those of the minority.

With respect to the employment of such agencies as steam and the like, the courts hold that they are absolutely necessary to the progress of the community, and each member must suffer the incidental damage and liability to danger which arises from their non-negligent use. They are not nuisances if properly maintained and operated.

But it will be readily perceived that there is a class of things to which this reasoning does not apply—things inherently dangerous, liable to explosion without negligence of the owner, and

so subject thereto that the greatest care is but slight assurance of safety. *Bradford Glycerine Co.* v. *St. Mary's Woolen Manufacturing Co., 60 Ohio St. 560; 45 L. R. A. 658* (at p. 661).

Gunpowder and nitroglycerine are examples of this class, and to a much greater extent are products of petroleum, the vapors from which are insidious, treacherous and almost incontrollable as respects danger of explosion.

The earlier cases dealing with gunpowder and nitroglycerine held that they were nuisances *per se.* See cases cited in note, *38 L. R. A. 308; Bradford Glycerine Co.* v. *St. Mary's Woolen Manufacturing Co., supra.*

The court of errors and appeals, in the case of *McAndrews* v. *Collerd, 42 N. J. Law (13 Vr.) 189 (1880)* (at p. 192), said: "The keeping of gunpowder, nitroglycerine or other explosive substances, in large quantities, in the vicinity of a dwelling-house or place of business, is a nuisance *per se,* and may be abated as such by action at law or injunction in equity."

But in *Simon* v. *Henry, 62 N. J. Law (33 Vr.) 486 (Supreme Court, 1896)*, the supreme court refused to apply this doctrine to a case where damage was done in the course of blasting in the construction of a public sewer through a highway. This latter case follows the decision of *Booth* v. *R. W. & O. R. Co., 140 N. Y. 267.* In that case the court held that the temporary use of explosives in order to adapt one's own premises to a lawful use, where the mode adopted was the only practicable one, and the work was prosecuted with due care and without negligence, was not a nuisance. But it was very careful to point out that there was a manifest distinction between acts and uses which are permanent and continuous and temporary acts which are resorted to in the course of adapting premises to some lawful use. And it cites those cases theretofore decided in the courts of New York holding that the keeping of gunpowder in large quantities near inhabited dwellings is a nuisance.

The distinction between a permanent and a temporary use is again alluded to in *Garvey* v. *Long Island Railway Co., 159 N. Y. 324; 32 Lawy. Ed. 920.*

I am of opinion that the same tendency heretofore alluded to has caused the courts to modify the arbitrary rule which re-

garded these things as nuisances *per se,* and that the present rule is that whether they are or are not nuisances depends upon the locality, the quantity and the surrounding circumstances, and the method and manner of keeping and use. *Heeg* v. *Licht, 80 N. Y. 579; Rudder* v. *Koopmann, 37 L. R. A. 489; Kinney* v. *Koopmann, 37 L. R. A. 497; Kleebauer* v. *Western Fuse and Explosive Co., 60 L. R. A. 377; Collins* v. *Alabama G. S. R. Co., 61 Am. & Eng. R. R. Cas. 229 (1894); High Inj. (3d ed.) 593 § 776 et seq.; 1 Pom. Rem. (5 Pom. Eq. Jur. 3d ed.) 869 § 515 et seq.; Barnes* v. *Zettlemoyer, 62 S. W. Rep. 111; Flynn* v. *Butler, 75 N. E. Rep. 730.*

In the case of *Heeg* v. *Licht, supra,* it is said: "In a city, with buildings immediately contiguous and persons constantly passing, there could be no question that such an erection [a powder magazine] would be unlawful and unauthorized. \* \* \* That the defendant's establishment was outside of the territorial limits of a city does not relieve the owner from responsibility or alter the case if the dangerous erection was in close contiguity with dwelling-houses or buildings which might be injured or destroyed in case of an explosion. The fact that the magazine was liable to such a contingency, which could not be guarded against or averted by the greatest degree of care and vigilance, evinces its dangerous character, and might in some localities render it a private nuisance. \* \* \* The keeping or manufacturing of gunpowder or of fireworks does not necessarily constitute a nuisance *per se.* That depends upon the locality, the quantity and the surrounding circumstances, and not entirely upon the degree of care used."

If this be the rule with respect to gunpowder *a fortiori,* should it be applied to gasoline? "As an explosive," it is said, "the danger is ten times greater than that of gunpowder. It ignites as soon as the blaze is applied to it and becomes explosive when the vapor from it mingles with the atmosphere, in which there happens to be a burning lamp or other light." *Standard Oil Co.* v. *Tierney, 14 L. R. A. 677* (at *p. 682*).

It must, of course, be understood that I am not resting this decision upon the dangers to surrounding property arising from fire. I am aware of the decisions which hold that increased

danger of fire is not a sufficient reason to restrain that which causes the increase of danger. It was well said by Chief-Justice Thompson, of the Pennsylvania supreme court, in *Rhodes* v. *Dunbar, 57 Pa. St. 274; 98 Am. Dec. 221,* cited with approval in *Rudder* v. *Koopmann, supra:* "It is not on the ground alone of their liability to fire, primarily or even secondarily, that they may possibly be dealt with as nuisances, but on account of their liability to explosion by contact with the smallest spark of fire, and the utter impossibility to guard against the consequences, or set bounds to the injury, which, being instantaneous, extends alike to property and persons within its reach. The destructiveness of these agents results from the irrepressible gases, once set in motion, infinitely more than from the fires which might ensue as a consequence. Persons and property in the neighborhood of a burning building, let it burn ever so fiercely, in most cases, have a chance of escaping injury. Not so when explosive forces instantly prostrate everything near them, as in the instances of powder, nitroglycerine and other chemicals of an explosive or intensely inflammable nature."

If the case were at common law, it would be left to the jury to determine whether this inherently dangerous thing was a nuisance, in view of the locality, the circumstances, the amount kept and the care shown.

It has been held that whether a given state of facts, if found to exist by a jury, constitutes a nuisance, is ordinarily one of law for the court, or, at least, a mixed question of law and fact. *Mayor of Frostburg* v. *Hitchens, 68 Md. 100* or *6 Am. St. Rep. 422.*

In equity, upon an application for an injunction to abate a nuisance, I am of opinion that if the facts are clear it is the duty of the court to determine the question, and there is no occasion to send it to law.

In the case in hand, the facts are practically undisputed.

Vehicles propelled by power within themselves now exist in great numbers, and must undoubtedly be considered as among the useful things at the disposal of mankind. Legislation respecting their presence and conduct upon the highway is con-

stantly being enacted. They are licensed by the state. The court would. not be justified, therefore, in applying obsolete rules to this situation, but must adapt the principles of law to the existing conditions. In a proper locality, amidst proper surroundings, it is not unlawful for the dangerous fluid used in these vehicles to be stored and used to fill the tanks of the vehicles, or for the vehicles with the fluid within them to be stored. But there is no occasion to relax the general principle so as to hold that this dangerous fluid may, because it is usable by these vehicles, be stored or used in a locality utterly unsuited and amidst surroundings not fitted and to an amount giving rise to great danger, or that the filled vehicles may be so stored.

The defendants have procured from the city a permit. This paper was not put in evidence, but it was stated by counsel, and is therefore an admission in the case to be dealt with, that it permitted the storage, outside of the building, but upon the premises, of one barrel of gasoline.

The facts are that in this frame building there are already stored automobiles, and it is the intention to store others, which contain tanks capable of holding ten gallons each of gasoline; that the gasoline from the underground tank is pumped into the building and there exposed to the air, and is placed in the tanks of the automobiles.

It is apparent, therefore, that in the usual course of business in this establishment there will always be within it tanks containing gasoline to a very large amount.

If the garage were filled to its capacity there would be twenty machines, containing ten gallons each, or two hundred gallons of gasoline. The permit is only for one barrel, or fifty-five gallons, and that must be kept outside of the building.

The danger arising from this fluid is created entirely by its use within a building or confined place, and leaking tanks of automobiles would be a very grave source of danger, since, as has been before explained, the vapor would sink to the floor, where it would be in close proximity to the lamps of the automobiles, which will undoubtedly be lighted when they come into the building at night, or when they are being prepared to go out.

The drivers of the automobiles and the users thereof, coming in and out of the building, will undoubtedly at times be careless in the use of matches.

All this takes place in a frame building in a residential neighborhood, in close proximity to other frame buildings, and to dwelling-houses in which a number of people abide. The building is almost directly upon the street, where those passing may well, by careless throwing of matches and the like, cause the apprehended explosion.

I am clearly of opinion that it is the duty of the court to restrain the defendants, with respect to the storage and use of this dangerous material upon their own premises, to such an extent as will have due regard for the interests of the complainant.

Courts of equity constantly, in cases of nuisance, prohibit such parts of what is being done as are found to constitute the nuisance.

The court, upon a preliminary hearing, where the facts are practically undisputed and where a final hearing would be but a repetition of the preliminary hearing, grants relief, even in cases requiring a mandatory injunction. *National Docks Railway Co.* v. *Pennsylvania Railroad Co., 54 N. J. Eq. (9 Dick.) 10 (Chancellor McGill, 1895).*

I find that the defendant should be restrained from introducing gasoline into the tanks of the automobiles inside the building and from storing automobiles with gasoline in their tanks inside of the building. By filling the tanks of the automobiles outside the building, and by emptying the tanks before the automobiles are taken into the building, the danger is minimized to the point where, under the necessities of the case, the complainants and others must endure the remaining risk.

The injunction, therefore, will restrain the storage or use of gasoline within the building.

The defendants cannot complain here that the complainants did not promptly act upon receipt of knowledge. As has been already noted, the building was commenced some time in the middle of October, and by the 5th of November this bill was

filed, so that the defendants had ample opportunity to either arrange their business so as not to constitute a nuisance or to go elsewhere to carry on the business if it could not be so arranged.

I will advise an order in accordance with these conclusions.