## THE INGRID.

### (District Court, S. D. New York. March 21, 1912.)

1. EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSIONS—LIABILITY OF CARRIERS.

In modern times when vast quantities of substances liable to explode, such as dynamite, gunpowder, and petroleum products, are used and required to be transported, a carrier of such explosives cannot be held an insurer against injuries which may result to others from their accidental explosion while in course of transit, but is liable only on the ground of negligence.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

**2.** EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY.

The question whether or not a railroad company is responsible for damage caused by an explosion of dynamite delivered into its possession as a carrier, and which was in a car standing on a pier, depends in the first place on whether the locality where it was kept and all the existing circumstances made it a nuisance per se, and, if not, whether there was negligence in leaving it or in the manner of handling and keeping it on the pier.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

**3.** EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY.

Respondent railroad company transported a car containing dynamite to Jersey City, where it was run out to the end of one of the company's piers for the purpose of having the dynamite transferred to a steamer expected to sail the next day. The sailing was delayed from day to day, and, as customary, the dynamite was left to be loaded last. On the sixth day after its arrival while it was being transferred to a lighter employed by the shipper, an explosion occurred which caused loss of life and large damage to property, including the wrecking of libelant's ship, which lay on the other side of the pier. The bill of lading provided that property not removed within 48 hours might be held by the company in storage or stored in a public warehouse at the owner's expense, but it was the custom to permit property intended to be loaded on vessels for foreign shipment to remain in the cars for ten days without demurrage. *Held* that, at the time of the explosion, the dynamite was in course of transportation and not in storage, and, it appearing that respondent was not chargeable with any negligence or violation of law as to the place where it was left, that it was not liable for the injuries caused by the explosion; also *held* that there was no evidence to charge either the maker of the dynamite, which was also the shipper and consignee, or the lighterage contractor with negligence, the cause of the explosion not being shown.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

**4.** EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY OF CARRIER.

In the absence of any statute on the subject, a railroad company cannot be required to establish and maintain a separate and isolated pier for the transference from its line to vessels of explosives.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

**5.** COMMERCE (§ 8*)—INTERSTATE COMMERCE—CARRIAGE OF EXPLOSIVES—REGULATIONS GOVERNING.

Section 233 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1135 [U. S. Comp. St. Supp. 1911, p. 1660]), by authority of which the Interstate Commerce Commission has formulated and issued regulations for the transportation of explosives by land, governs as to all such transportation in interstate or foreign commerce to the exclusion of state laws.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

In Admiralty. Suit by Actiesselskabet Ingrid, owner of the Norwegian ship Ingrid, and others, against the Central Railroad Company of New Jersey, the E. I. Du Pont de Nemours Powder Company, and James Healing. Decree for respondents.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Convers & Kirlin (J. Parker Kirlin, advocate), for libelants.

James T. Kilbreth and Charles E. Miller, for Central R. Co. of New Jersey.

Townsend & Button, for E. I. Du Pont de Nemours Powder Co.

Charles J. Kelaher, for James Healing.

HOLT, District Judge. This is a suit in admiralty brought by a Norwegian corporation, the owner of the Norwegian ship Ingrid, and by the captain of the ship, to recover for damages caused by an explosion which took place February 1, 1911, at the end of the pier at Jersey City at which she was lying. The original suit was brought against the Central Railroad Company of New Jersey and the E. I. Du Pont de Nemours Powder Company, as respondents. The Railroad Company, by petition, in analogy to proceedings under the fifty-ninth rule, brought in as a party respondent James Healing, the owner of the steam lighter Katherine W. At the time of the explosion the Ingrid was lying on the south side, and a short distance from the end, of Pier 7, in the freightyard of the Central Railroad Company of New Jersey, at Communipaw, Jersey City. The pier had upon it four railroad tracks. The Ingrid was unloading cargo into a car on the track nearest her. On the northernmost of the four tracks, on February 1st, was standing a line of about 11 freight cars. The most easterly of these cars, near the end of the pier, was car No. 91442 of the New York, New Haven & Hartford Railroad. This car arrived at Communipaw on January 25, 1911, and had been placed on the pier on January 26th. It originally contained 670 cases of dynamite, shipped by the respondent the Du Pont Powder Company at Kenvil, N. J., under a bill of lading which consigned the shipment to the shipper at Communipaw. Three hundred of the cases had, in fact, been sold and were being shipped to Carlisle, Crocker & Co., of Montevideo, South America, and were marked with that address. Arrangements had been made that they should be forwarded upon the steamship Inveric, which at the time the shipment was forwarded from Kenvil was expected to sail about January 26th. After the arrival of the cargo at the pier at Jersey City, the 370 cases which were not addressed to Carlisle, Crocker & Co., were removed from the car, some on the 26th and some on the 28th of January. The remaining 300 cases remained in the car. The Inveric postponed sailing from day to day. It is the custom of steamships taking high explosives to take them on board after the rest of the cargo has been loaded, just before sailing. The Powder Company had a contract with James Healing, the owner of the steam lighter Katherine W., to carry explosives shipped by it from the cars to vessels upon which they were to be shipped, or to other places about the harbor. Notice was given to Healing on January 26th to be ready to transfer the 300 cases to the Inveric as soon as she would be ready to receive them. The date of sailing was postponed from day to day until notice was received on January 31st that the Inveric would sail the next day, and in accordance with such notice the Katherine W. came to Pier 7, and moored on the north side of the pier, opposite car No. 91442, about

11:30 a. m. on February 1st. The captain and crew of the Katherine W. thereupon proceeded to unload the boxes of dynamite in the car, sliding them down an inclined plane, upon the deck of the Katherine W. While this operation was in progress, about 12 o'clock, an explosion of great violence occurred. Many of the witnesses testify that they heard two explosions in rapid succession; the second one being louder than the first. Other witnesses heard but one explosion. The result of the explosion was that the Katherine W. and the boxes of dynamite which had been transferred from the car were completely demolished. Only small fragments of the lighter were afterwards discovered in various places in the neighborhood. All the men on board were blown to pieces. Car No. 91442 and the dynamite on board and the men engaged in unloading it were blown to pieces. The iron frame or floor of the car, in a twisted condition, was blown on to the deck of the Ingrid. One set of trucks of the car also landed on the deck of the Ingrid, and another set was found in the water near the pier. The whole end of the pier was badly demolished. A number of men at and about the end of the pier were killed. A boat, Whistler, which lay on the north side of the pier just beyond the Katherine W., had its stern blown to pieces, and sank, and the men on board were killed. The car next to 91442, which also contained dynamite, was blown off the track on which it stood, and upon and across the adjoining track. Some of the dynamite in the car was thrown out, but did not explode. The easternmost car on the track next the Ingrid was thrown off the pier into the water. Everything in the neighborhood was more or less damaged. Many buildings downtown in New York City, a mile away, were noticeably shaken, and a large amount of windowglass broken in such buildings. On the Ingrid one man was killed, several others were badly injured, and the Ingrid itself was completely wrecked. The masts and rigging were broken, the deck was covered with wreckage, logs, beams, frames of a railway car, railway wheels and rails. The bulwarks, chain plates, deckbeams, and stanchions were broken and twisted. All the walls and partitions in the cabin were blown down and heaped together in the middle; in short, the vessel was a complete wreck. A survey was had. The surveyors reported that the repairs necessary to put her in order would cost about $36,000, which would be more than the value of the ship when repaired. The result was that the ship was put up at auction, and sold for about $4,000, practically the value of the iron and other metal used in her construction, and this suit is brought to recover for the damage so caused to the ship.

[1] The libelants claim that the existence of such a large quantity of dynamite on Pier 7 was a nuisance, which renders the railroad company liable for the damage suffered by the libelants in consequence of the explosion. They rely, in the first place, on the doctrine of the English case of Rylands v. Fletcher, 3 H. L. 330. In that case the defendant erected on his own land a reservoir of water which gave way, without any negligence for which the defendant was responsible, as a result of which the water ran onto the plaintiff's land and flooded his mine, causing damage. In that case the court laid down as a rule of law that:

"The person who, for his own purposes, brings on his hand or collects or keeps there anything likely to do mischief if it escapes, must keep it at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape."

This doctrine has not been generally adopted in this country. It has been expressly repudiated in New Jersey (Marshall v. Wellwood, 38 N. J. Law, 339, 20 Am. Rep. 394; O'Hara v. Nelson, 71 N. J. Eq. 161, 63 Atl. 836), in New York (Losee v. Buchanan, 51 N. Y. 476, 10 Am. Rep. 623), and in many other states. Some of the earlier authorities in this country held in the case of gunpowder and similar explosives substantially the doctrine of Rylands v. Fletcher; that is, that, if they exploded and did damage, the owner was responsible, without proof of negligence, on the same ground as a man who keeps a wild beast is responsible if it escapes, and does damage. But the more modern authorities establish that the question whether the presence anywhere of a large quantity of dynamite or other dangerous explosive is a nuisance depends upon the question of its situation and surrounding circumstances. The attitude of the courts in modern times in respect to explosives is well stated in the case of Kleebauer v. Western Fuse Company, 138 Cal. 497, 71 Pac. 617, 60 L. R. A. 377, 94 Am. St. Rep. 62, as follows:

"Steam, powder, gas, electricity, dynamite, gunpowder are in daily use, and have become indispensable to the convenience of the public and for the public defense. Invention of man and advancement of science have enabled the manufacturer or dealer in these articles to provide the public or the individual with almost, if not altogether, absolute protection against danger or hurt from explosion. And, even had the manufacturing and storing of gunpowder in its early history been a nuisance at common law, the common-law definition of a nuisance would not include gunpowder at this day."

[2] The question, therefore, whether the Railroad Company is responsible for the dynamite which exploded depends, in the first place, upon whether the locality where it was kept and all the existing circumstances made it a nuisance per se, and, if not, whether there was negligence in leaving it, or in the manner of handling and keeping it, on the pier. Heeg v. Licht, 80 N. Y. 579, 36 Am. Rep. 654; Cosulich v. Standard Oil Co., 122 N. Y. 118, 25 N. E. 259, 19 Am. St. Rep. 475; Melker v. City of New York, 190 N. Y. 488, 83 N. E. 565, 16 L. R. A. (N. S.) 621, 13 Ann. Cas. 544; O'Hara v. Nelson, 71 N. J. Eq. 161, 63 Atl. 836; Tuckachinsky v. Lehigh Coal Co., 199 Pa. 515, 49 Atl. 308; Kinney v. Koopman, 116 Ala. 310, 22 South. 593, 37 L. R. A. 497, 67 Am. St. Rep. 119.

[3] On the question whether the situation and circumstances connected with the existence of the dynamite at the time of the explosion on Pier 7 constitued a nuisance, it is important, in the first place, to determine in what capacity the Railroad Company was holding it. The bill of lading issued to the Powder Company, under which the shipment on car No. 91442 was carried by the Railroad Company, contained a provision that:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage, and to car-

rier's responsibility as warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse, at the cost of the owner."

The libelants claim that, under this provision of the bill of lading, 48 hours after the arrival of the dynamite at Communipaw the Railroad Company ceased to hold the dynamite as a common carrier, and held it as a warehouseman, and that the dynamite in the car was not any longer in course of transportation, but was held in storage by the Railroad Company. The dynamite originally in the car, other than the 300 cases which were to be sent to Montevideo, was removed within 48 hours after the arrival of the car. The evidence shows that, in the case of articles intended to be transferred to steamers for shipment to foreign countries, the Railroad Company usually allowed 10 days, free of demurrage, for effecting such transfer. The custom of all steamers in shipping explosives is not to put them down in the hold, which would obviously be dangerous, but to take them on board after the rest of the cargo is stowed. The Powder Company was under no obligation to remove the dynamite from the car until the expiration of the 10 days, provided it had reason to suppose in good faith from day to day that the steamer would be ready to receive it on the following day. Of course, if large quantities of dynamite were brought to such a pier, and left there an unreasonable time before being removed, it would cease to be in course of transportation, and might properly be held to be stored on the pier; but in my opinion the evidence in this case does not establish any such condition. Although, at the time of the explosion, the dynamite had stood in the car at the end of the pier for six days, I think that it was still in course of transportation, and that the Railroad Company is not responsible for it as having it in storage, but that their responsibility is that of any carrier engaged in transporting such an explosive.

[4] It is claimed that the pier was an improper place on which to deliver such a quantity of dynamite. But this claim seems to me untenable. Pier 7 was the pier farthest south in the Railroad Company's yards. It was as far removed from the other property in the yard as the car could be placed. It is claimed that railroad companies should be required to obtain a pier in an isolated part of the shore of the harbor. Aside from the physical difficulty and practical impossibility of all the great railroad lines which come into New York obtaining such piers, it is sufficient to say that the state of New Jersey has not passed any law requiring it, and, in the absence of such a law, I do not think that the railroad company in this case should be held liable to any such extreme precaution. Dynamite is, of course, in one sense an extremely dangerous substance. If it explodes, the consequences of the explosion may be very serious. But, in fact, the danger of the accidental explosion of dynamite is not now great. The evidence shows that last year there was manufactured and sold in the United States about 260,000,000 pounds of dynamite. It is an article of very extensive use in all forms of mining, in canal, and railroad building, and in tunneling and construction work of all varieties. Many car loads of it are daily transported in railroads all

over the country. Experience shows that it is not as liable to explode as naphtha and the other products of petroleum or steam boilers. The simple truth is that in modern times the use of articles which are liable to explode and do damage has become universal, and, if it were to be held that any one who makes use of such instrumentalities as steam, gas, gasoline, gunpowder, and dynamite is an absolute insurer against any injury resulting from their explosion, irrespective of any question of negligence, it would largely restrict the use of such agencies. I think that the dynamite exploded on Pier 7 was in course of transportation by the Railroad Company, that there was no negligence by the Railroad Company either in permitting the car to stand at the end of the pier as long as it did, or in any other respect.

Some reference is made in the libelants' brief to the fact that the Ingrid was first moored at Pier 6, and began discharging cargo there, and was then removed, by direction of the Railroad Company, to Pier 7. The master at first protested against moving, but his objection was evidently based on his assumption that he would be put to the trouble and expense of moving. When the Railroad Company agreed to move the ship, the master acquiesced. I think the new position was not apparently any more dangerous than the old one, and I cannot see that the mere fact of this shifting of the ship affords any legal ground of liability.

[5] The libelant claims that the Railroad Company violated the law of New Jersey, and the ordinances of Jersey City, in respect to the storage of explosives. In the first place, in my opinion, the liability of the Railroad Company, while transporting this dynamite, was governed exclusively by the act of Congress of March 4, 1909, which provides that the Interstate Commerce Commission shall formulate regulations for the safe transportation of explosives which shall be binding on all common carriers engaged in interstate or foreign commerce which transport explosives by land. Under this act, the Interstate Commerce Commission has formulated and issued regulations for the transportation of explosives, and it is not claimed that those regulations have not been complied with by the defendants. Congress having passed such a law, it clearly governs in my opinion all common carriers who come within its provisions, and takes the place of all local laws and ordinances on the subject. Southern Ry Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. ——; Northern Pacific Ry. Co. v. State of Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. ——; Southern Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 424. If it did not, a railway company transporting dynamite over a long railroad system, passing in the trip through various villages, cities, and states, would be subject at every stage of the journey to varying local regulations which probably it could not observe. It is pre-eminently just that in such cases there should be a central authority, prescribing what the Railroad Company, in the transportation of such explosives, should do. The fact that the bill of lading only described the shipment as being from Kenvil to Communipaw, within the state of New Jersey, did not change the fact that as to the 300 cases addressed to Carlisle, Crocker & Co.,

Montevideo, it was a foreign shipment. Gulf, etc., R. R. Co. v. Fort Grain Co. (Tex. Civ. App.) 72 S. W. 419.

Even if there were no act of Congress in existence, I think that there is nothing in the statutes of New Jersey or the ordinances of Jersey City which applies to this case. Those statutes and ordinances all apply, in my opinion, to the case of persons manufacturing explosives or storing and keeping them permanently in cities or dangerous places. There are expressions in these statutes and ordinances prohibiting any one from "having or keeping" explosives except under certain restrictions, but it is apparent from the context that those expressions refer to having or keeping explosives on permanent storage, or for sale, or while manufacturing them. They do not apply in my opinion to a railroad company transporting them from one place to another.

This was an extraordinary accident, causing great loss of life and damage to property. But there is substantially no evidence how it occurred. I think, from the evidence, that probably something on the Katherine W. exploded first, and that that explosion detonated all the dynamite on the boat and in the car. The Railroad Company claims that the boiler in the Katherine W. exploded, but on the evidence in the case it is impossible to determine accurately whether the boiler of the Katherine W., or some of the dynamite which was being delivered upon her deck, or the dynamite in the car, first exploded, or indeed how the accident happened. Every person near enough to the accident to have given evidence as to how it occurred was instantly killed, and I cannot see from the evidence in this case any ground for holding that any of the defendants were liable in any respect. The Railroad Company's men were not handling the dynamite. That was being done by the crew of the Katherine W. I see no ground for any criticism against the Powder Company. The proof is clear that the dynamite was well manufactured, that it was safely packed, and that it was properly stowed in the car. The fact that other dynamite in adjacent cars did not explode shows that the Du Pont Company is generally careful and skillful in preparing dynamite for shipment. It came safely to Jersey City. The Powder Company, as the consignee, immediately notified Healing to have the Katherine W. in readiness to remove the dynamite as soon as the steamer Inveric was ready to take it. Nor can I see any ground on which to hold Healing, the contractor, for the removal of the dynamite. He had been for a considerable time engaged in the business of moving explosives about the harbor. His crew were experienced and careful men. They went to the pier as soon as they were directed to go there, and proceeded to engage in removing the dynamite. There is no proof that they were careless in their work, or that any negligence on their part caused the explosion. Undoubtedly they may have been negligent, and their negligence may have caused the explosion. But, as the explosion was so violent that it practically destroyed all the witnesses and evidence from which any accurate conclusion can be drawn as to what the cause of it was, it is impossible to hold the respondents liable. It is undoubtedly a hard case for the libelants, whose ship was completely wrecked, while lying

·quietly at a pier, in a harbor, without any fault on the part of its officers or crew. But it appears to be the case of an accident, the cause of which cannot be ascertained, and therefore for which none of the respondents can be held responsible in this suit.

My conclusion is that there should be a decree for the respondents, dismissing the libel against the Central Railroad Company of New Jersey and the Du Pont Powder Company and the petition against ·Healing, on the merits, with costs.