MICHAEL RONAN et al.

*v.*

THOMAS M. BARR.

[Argued November 11th, 1913. Decided December 8th, 1913.]

1. Where complainants' bill to enforce an implied restrictive covenant upon lands alleged that the common grantor, which owned the fee to a number of the lots, to induce persons to buy, adopted a general plan for their development which provided that each lot should be subject to a covenant not to build on the described premises any building costing less than $3,000 or to permit the premises to be used for a milk stable, piggery, hennery, slaughter-house, or certain other described purposes, or any other nuisance whatsoever, complainants cannot recover on representations by the common grantor that the premises should be used for residential sub-divisions only; that matter not being pleaded.

2. Restrictive covenants upon land are to be strictly construed, and, unless the right to restrict is clear, an injunction will not issue to enforce the covenant.

3. A general covenant relating to land, which inhibits the erection of any building on lots costing less than $3,000, cannot be construed as prohibiting the erection of any structure other than a dwelling-house, for the word "building" has a broader signification.

4. Under a restrictive covenant relating to lands and prohibiting the use of any of the lots for any nuisance whatsoever, lot owners have no right to enjoin the erection of a public garage; a public garage not being a nuisance *per se.*

5. In an action to enforce restrictive covenants upon land, where the bill did not count upon representations and a general purpose to make a residential district out of the land, evidence tending to show that the vendors intended the land to be used for residential purposes is inadmissible.

On final hearing. On bill, answer and proofs.

*Mr. George S. Silzer,* for the complainants.

*Mr. Edward W. Hicks,* for the defendant.

BACKES, V. C.

This is a bill to enforce an implied restrictive covenant upon lands. The case made by the bill is: On August 3d, 1907, the Metuchen Building Company acquired the fee to lots Nos. 3, 24, 25, 26, 27, 28, part of 4 and 5; a part of lots Nos. 16 (and 17), and lots Nos. 7, 11, 12, 13, 14 (15), 18, 19, 20, 21 and 32 of a plot entitled "A map of 32 lots belonging to the estate of E. S. Peck, situate at Metuchen, New Jersey." In order to sell the lots and induce persons to buy, the company adopted a general plan and uniform scheme for their development, which included that each lot should be sold subject to this covenant:

"1. That the said party of the second part, his heirs-at-law, legal representatives or assigns will not erect or permit, on any part of the herein described premises any building costing less than three thousand dollars.

"Excepting, however, such barn, stable or other building for horses and vehicles as is appurtenant to a private residence, but no part of such barn and stable, if erected, shall be less than one hundred feet from the northerly line of Highland avenue nor shall more than one such building and one such stable be erected or permitted on the premises herein mentioned and described.

"2. And the party of the second part, for himself, his heirs-at-law, legal representatives and assigns further covenant that he or they will not use or permit to be used, the said premises or any part thereof for a milkman's stable, piggery, hennery, slaughter-house, smith shop, forge, furnace, brass foundry, tin, nail, or other factory or any manufactory for the manufacture or making of gunpowder, glue, varnish, vitriol, ink or preparing of skins, hides or leather or any brewery, distillery, oil or lampblack factory or any other nuisance whatsoever.

"3. And the said party of the second part for his heirs-at-law, legal representatives and assigns does hereby further covenant and agree to and with the party of the first part, its successors and assigns, that neither the said party of the second part nor his heirs-at-law, legal representatives or assigns will sell or suffer or allow to be sold on the premises hereby conveyed or any part thereof, any spirituous liquors or ale, beer or wine or intoxicating liquors of any kind.

"4. The party of the second part, for himself, his heirs-at-law, legal representatives and assigns, does hereby further covenant and agree to and with the party of the first part, its successors and assigns, that no building shall be erected on the premises hereby conveyed nearer than thirty feet from the northerly established street line of Highland avenue. But it is understood that porches or verandas and bay windows of reasonable dimensions from the main building shall be allowed to project into the above mentioned restricted part of the premises hereby conveyed.

"All restrictions and covenants in this instrument contained shall continue in force until the first day of January, 1928, and no longer."

"The reason of said covenants or restrictions in the deeds to·
purchasers being intended for the benefit of the said company
in selling said lots and securing a good price therefor, and also
intended for the benefit of each purchaser of lots upon said tract,
the said tract being intended and held out by said Metuchen
Building Company to be used only for residential purposes."
Upon application to the company for the purchase of lots, the
complainants were told that the tract was restricted and that no
lot could be purchased unless the deed contained the above cove-
nant, and that each purchaser of a lot would be protected in his
purchase in that all other conveyances would be likewise re-
stricted. Relying upon these representations, the complainant
Greenwalds, on April 16th, 1909, bought lot No. 14 and a part of
lot No. 13. On April 17th, 1911, the complainant Litterests
purchased parts of lots Nos. 12 and 13, and on February 18th,
1912, the complainant Ronans acquired lot No. 28. The cove-
nant was incorporated in the Ronan deed. (The bill does
not disclose whether they were inserted in the Greenwald and
Litterest deeds.) Lansing Y. Lippincott bought lot No. 24 on
August 14th, 1909, and on July 8th, 1913, Lester B. Hebberd
purchased lot No. 19. (They are not complainants.) Their
lots are restricted. On September 9th, 1913, the company sold
to the defendant, Thomas M. Barr, lots Nos. 3, 4 and 5, upon
which he is about to erect a public garage in violation of the
covenant. The Barr deed is free of encumbrance. It is charged
that he took his title with notice of the company's scheme and of
the restrictions to be imposed in the execution of that scheme.
The prayer of the bill is that Barr may make answer "and that
he may be decreed to answer why a writ of injunction restraining
him, his agents, servants and contractors from proceeding further
with the erection of a public garage on said lots." This is
*verbatim* the special prayer. The bill contains a general prayer
for relief, and I shall treat it as including a special prayer for an
injunction restraining the defendant from building a public
garage.

The Peck tract is a quadrangular plot of. ground, with lots of
irregular sizes, fronting on Main street and Middlesex and High-
land avenues, and numbered consecutively from Nos. 1 to 31 in-

clusive. Lot No. 32 is detached. It was plotted by the Peck estate in 1891, and from time to time the estate sold lots to various parties, without burthen, until August 3d, 1907, when the remaining seventeen lots and parts of lots scattered throughout the tract, were sold to the Metuchen Building Company, the common grantor of the complainants and defendant. Store buildings had been erected on lots fronting on Main street. At this time, lots Nos. 8, 9 and 10, 22 and 23 were occupied by a social club, and lots Nos. 6 and 7 by a civic association. Lot No. 15 and the rear of Nos. 16 and 17 were owned by Greenwald and his partner Soper, the rear of the lots Nos. 16 and 17 being used for a carpenter shop. No. 30 was occupied by one Hamm as a public garage; No. 29 by a two-family dwelling-house. A fire-engine-house was on lot No. 22, and the land westerly of it and the Hamm garage to Main street was built up by stores, so that when the Metuchen Building Company took title to the remnant of the tract, this heterogeneous aggregation of structures made impossible a uniform plan or scheme of building covering the entire plot. The fact, however, is that the company ventured the imposition of restrictions upon the use of the lots it sold. Sometimes they were put in the deeds and at other times they were stipulated by separate agreement. They vary widely. Some restrict the use of the lots to "buildings," while others require the building to be a dwelling-house. One owner has the privilege of raising chickens on his lot, which is denied to others. Some may build factories, while others cannot. Factories of certain kinds may be built by one owner; others are prohibited. Some deeds contain a clause against nuisances, which is omitted in others. In fine, instead of uniformity of restrictions, there is confusion.

(1) The complainants' counsel at the hearing, and upon the argument, urged that it was represented to the complainants at the time they took their deeds, that the lots were to be used for residential purposes only, and that this representation should be construed in connection with the covenant set out in the bill and enforced as a part of the restrictions. I do not pause to consider the merit of this contention except to note that it is not supported by the evidence, for it is manifest that these rep-

resentations, if made, form no part of the case made by the bill. It will be observed that the bill ties the cause for complaint to a threatened violation by the defendant of the restrictions above set out. The allegation of the bill that the tract was intended and was held out by the company to be used only for residential purposes, is pleaded solely by way of inducement. The pleadings and proofs clearly show that the limitation upon the use of the lots for residential purposes, was not to be greater than these restrictions would afford. That this was the understanding of the complainants at the time they purchased, is clear, for it appears that they were apprised in detail of the terms of the restrictions and bound themselves in the use of their lots only to the extent of the covenant contained in their respective deeds.

(2) I shall assume, without deciding, that the covenant, of which the one set out in the bill is the model, was adopted by the Metuchen Building Company as a part of a locality scheme (although I must say that in a situation so chaotic as we find here, the feasibility of a community plan or scheme is inconceivable), and that the restrictions inure to the advantage of and may be enforced by the grantees of the company against each other upon that theory. *Morrow* v. *Hasselman, 69 N. J. Eq. (3 Robb.) 612; Bowen* v. *Smith, 76 N. J. Eq. (6 Buch.) 456; Elliston* v. *Reacher (1908), 2 Ch. 374;* or "upon the principle of preventing a party having knowledge of the just rights of another, from defeating such rights." *Brewer* v. *Marshall, 19 N. J. Eq. (4 C. E. Gr.) 537; Hayes* v. *Waverly & P. R. R. Co., 51 N. J. Eq. (6 Dick.) 345; Kirkpatrick* v. *Peshine, 24 N. J. Eq. (9 C. E. Gr.) 206;* and shall also assume that the defendant, Barr, was cognizant of the restrictions, and that they are enforceable against him. This, then, brings us to the question whether the defendant's proposed erection of a public garage on lot No. 5 will violate the covenant.

(3) The first paragraph of the covenant interdicts the erection of any "building" costing less than $3,000. The complainants contend that the word "building" means dwelling-house, and that it should be so construed. This is inadmissible. Definition refutes the argument. It cannot be gathered from the context of

the covenant that the parties intended the word "building" to imply a certain kind of building. To interpret the word "building" to mean dwelling, would prevent the erection of a church, a theatre, a municipal building, a hotel or private club house, which, without doubt, was not within the contemplation of the parties. I cannot read into the covenant a restriction which the parties did not agree to. It is a well-established principle that covenants which restrict another in the use to which he may put his lands are strictly construed, and unless the right to restrict is made manifest and clear in the covenant, a court of equity will not aid by its process of injunction one owner to restrict another in the otherwise lawful use to which he may put his lands. *Howland* v. *Andrus, 81 N. J. Eq. (11 Buch.) 175; Underwood* v. *Herman & Co., 89 Atl. Rep. 21.*

(4) The second paragraph of the covenant proscribes the use of the lots for purposes therein specifically mentioned, "or any other nuisance whatsoever." The erection of a public garage *eo nomine* is not prohibited, but it is insisted that to permit one to be erected and operated would create a nuisance.

To read this into the clause inhibiting nuisances necessarily requires a finding that a public garage is a nuisance *per se.* This it surely is not. It is a place for the housing of automobiles. The business is a lawful one, and the presumption is that it will be lawfully carried on. In such circumstances a court of equity will not interfere. If in the prosecution of the business a nuisance is created it may interpose. This court refused to restrain as a nuisance the erection of a blacksmith shop, *Butler* v. *Rogers, 9 N. J. Eq. (1 Stock.) 487;* a factory for manufacturing agricultural implements, *Wolcott* v. *Melick, 11 N. J. Eq. (3 Stock.) 204;* a pottery, *Ross* v. *Butler, 19 N. J. Eq. (4 C. E. Gr.) 294;* a gas works, *Cleveland* v. *Citizens Gas Light Co., 20 N. J. Eq. (5 C. E. Gr.) 201;* a slaughter-house, *Attorney-General* v. *Steward & Taylor, 20 N. J. Eq. (5 C. E. Gr.) 415;* a saw-mill, *Duncan* v. *Hayes & Greenwood, 22 N. J. Eq. (7 C. E. Gr.) 25;* a pest-house, *State Board of Health* v. *Trenton, 68 Atl. Rep. 897.* Each of these cases exhibits a situation of impending harm of far greater magnitude than that shown here, and in all of them the court refused to interfere

with the building, although in some instances it enjoined a particular method of carrying on the business which threatened or proved to be injurious to others, and in this respect a nuisance. In *O'Hara* v. *Nelson, 63 Atl. Rep. 836* (at *p. 842*), Vice-Chancellor Garrison restrained the storage or use of gasoline within a garage, but he did not condemn the garage as a nuisance. While some of the cases came up on motion for preliminary injunction, and others were disposed of on final hearing, the same principle predominated, that equity will not interfere by injunction to restrain the erection of a building unless the building is so intimately and essentially a part of an unlawful business as to make it apparent that the combination of building and business spells nuisance. As was said in *Cleveland* v. *Citizens Gas Light Company, supra,* when it is not made to appear that the business for which the building is intended cannot possibly be carried on without becoming a nuisance, this court will deny the injunction. These authorities are illustrative of what may constitute nuisances within the meaning of the covenant sought to be enforced and are absolutely dispositive of this phase of the case. It is pertinent to add that the doctrine already alluded to, which requires in cases of this kind that there must be no ambiguity or uncertainty in the covenant, is invocable and destructive of the claim set up by the complainants.

(5) The evidence submitted that the covenant in the deeds of one or more purchasers of lots interdicted public garages and that the Metuchen Building Company refused to sell two of the defendant's lots to prior applicants unless they were restricted as to public garages, tending to support the complainants' contention that the company's policy was to limit the use of its lots to residential purposes, and which I have already pointed out is not within the scope of the bill, is in the view I have taken of the case, wholly immaterial.

The bill will be dismissed, with costs.