ACTIESSELSKABET INGRID et al. v. CENTRAL R. CO. OF NEW JERSEY et al.†

(Circuit Court of Appeals, Second Circuit. July 2, 1914.)

No. 168.

1. EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSIONS—LIABILITY.

One of the respondents, a manufacturer of explosives, shipped dynamite in car loads on the road of its corespondent railroad company to be loaded on vessels for export. The railroad company ran the cars out to the end of its pier, where they were to be unloaded by another respondent, employed by the shipper, into a lighter. While one of the cars was being so unloaded, there was an explosion of the dynamite therein, which caused loss of life and large injury to property, including the wrecking of libelant's vessel, which was lying on the other side of the pier. The dynamite was made, packed, and loaded in the car by experienced men, and the respondent, who was unloading it, had handled such explosives in a similar manner for 25 years without accident, and kept the lighter for such use exclusively. The cause of the explosion was unknown, nor was it known whether the first explosion was in the car or the lighter.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† For opinion on petition for rehearing, see 216 Fed. 991, 132 C. C. A. 665..

There was no evidence of negligence on the part of either respondent or of any of their employés. *Held*, that neither of respondents was liable for the loss of libelant's vessel.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

2. EXPLOSIVES (§ 7*) — INJURIES FROM ACCIDENTAL EXPLOSION — LOADING DYNAMITE FROM PIER—NUISANCE.

The transfer of the dynamite from the pier did not create a nuisance which would render the parties liable, regardless of negligence, where it was shown that the place was the most remote of any that could be used, and was a mile from the nearest property or street, nor did the fact that the car was kept there for six days because of a delay before the dynamite could be received on board the ship constitute a storage, as distinguished from a part of the transportation.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

3. EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY— RES IPSA LOQUITUR.

Neither of the respondents could be held liable under the doctrine of res ipsa loquitur, since, admitting its applicability, there was no evidence to show which, if either, was chargeable with the negligence presumed.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

4. NEGLIGENCE (§ 63*) — NATURE AND ELEMENTS — INCIDENTAL INJURY FROM CONDUCT OF LAWFUL BUSINESS.

One engaged in a lawful business, which does not create a nuisance, is not liable for an incidental injury to another, resulting therefrom, without proof of negligence or fault on his part.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 80, 81; Dec. Dig. § 63.*]

5. EXPLOSIVES (§ 7*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY OF CARRIER.

Dynamite has become a necessity in the industries, and the construction of works of public improvement, and is a legitimate subject of commerce which a common carrier is bound to accept and transport, and, so far as the carrier is concerned, such injury as necessarily results to others from the performance of its duty, without negligence, must be borne by them as an unavoidable incident of the lawful conduct of legitimate business.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

6. COMMERCE (§ 61*)—REGULATIONS GOVERNING SHIPMENT—INTERSTATE COMMERCE—EXPLOSIVES.

A shipment of explosives in interstate or foreign commerce while in course of transportation is subject exclusively to the regulations prescribed by the Interstate Commerce Commission, and state or local laws have no application to it.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 81–84, 89; Dec. Dig. § 61.*]

7. EXPLOSIVES (§ 7*)—INJURY TO VESSEL—LIABILITY OF WHARFINGER.

A railroad company, which directed a connecting vessel to discharge at one of its piers, where she was destroyed by an explosion of dynamite being unloaded from a car on such pier, *held* not liable because of its failure to notify the master of the presence of the dynamite, which was a commodity commonly handled at such places and usually with safety, and where also the cars were marked with the regular danger placards.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree in admiralty of the District Court of the United States for the Southern District of New York, dismissing a libel.

For opinion below, see 195 Fed. 596.

Convers & Kirlin, of New York City (J. Parker Kirlin, John M. Woolsey, and Robert S. Erskine, all of New York City, of counsel), for appellants.

James T. Kilbreth, of New York City (Charles E. Miller, of New York City, of counsel), for appellee Central R. Co. of New Jersey.

William H. Button, of New York City (J. P. Laffey, of Wilmington, Del., of counsel), for appellee E. I. Du Pont de Nemours Powder Co.

Charles J. Kelaher, of New York City, for appellee James Healing.

Before COXE and ROGERS, Circuit Judges, and MAYER, District Judge.

ROGERS, Circuit Judge. [1] This libel was filed by the owner and master of the ship Ingrid to recover the sum of $30,162.65 damages caused by the explosion of a car load of dynamite, which occurred February 1, 1911, at pier 7 of the Central Railroad Company of New Jersey in Jersey City. The Ingrid had arrived from Buenos Ayres with a cargo of bones which was to be unloaded into the cars of the Central Railroad Company of New Jersey, hereinafter referred to as the railroad company, and was moored to the pier under the orders of that company, and for its own convenience, and was lying there discharging its cargo when the explosion took place. The Ingrid was a Norwegian sailing vessel, having a net tonnage of 1,217 tons and a rating in Lloyd's Register of "A1 (Star)." She was worth $25,000. The explosion completely wrecked the vessel. A survey was made of her and the surveyors recommended her sale as a wreck. The price paid for her at the auction was $4,375, which was practically the value of the scrap iron and of the supplies which remained in her after the explosion. The surveyors had reported it would cost $36,000 to put her in a state of repair, and that would have been more than she would have been worth.

The dynamite which caused the explosion had been shipped by the E. I. Du Pont de Nemours Powder Company, hereinafter called the powder company, and was consigned to itself at Jersey City and was shipped from Kenville, where the powder company had one of its plants, in the state of New Jersey, being transported in three cars which were hauled by the railroad company. These cars contained 1,493 boxes of dynamite in all; each box weighing at least 25 pounds. The dynamite which exploded was in car No. 91,442. That car contained 670 cases of dynamite weighing 38,975 pounds. The powder company had contracted with James Healing to remove the boxes of dynamite from car No. 91,442 to a steam lighter Katherine W., which he owned. The railroad company, the powder company, and Healing were all made respondents.

The Katherine W. was brought to pier 7 and there moored. The pier was about 1,000 feet long and 60 feet wide and had four tracks on it. Car 91,442 stood on one of the tracks and opposite the Katherine W. The captain and crew of that vessel were engaged in unloading the dynamite from the car to the boat by sliding the cases down a plank which ran from the door of the car to the forward deck of the boat at an incline of about three feet; the cases being passed down one at a time. During the progress of the unloading, the explosion occurred. Some of the witnesses testified they heard only one explosion, but others testified they heard two in rapid succession. The Katherine W. was completely demolished. Car No. 91,442 was also blown to pieces. The car standing next to No. 91,442 was lifted off the track and deposited upon an adjoining track, and a second car was blown off the pier and into the water. The Whistler, a boat also alongside the pier and near the Katherine W., was sunk, and everybody on board was killed. The pier itself was very badly injured, and the outer end of the pier and its crib were demolished. The shock of the explosion was felt in the office buildings of lower Manhattan.

It is matter of common knowledge that dynamite has been generally used and transported as an article of commerce for more than a quarter of a century. The evidence shows that during the year in which this explosion occurred upwards of 260,000,000 pounds of high explosives were manufactured and consumed in the United States. They are transported by the common carriers generally in car load lots. During the year of this explosion, if the high explosives manufactured that year be reduced to car load lots of 30,000 pounds each, there was an average of more than 33 car loads per day moving over the highways of commerce in this country alone. These high explosives have become a real commercial necessity, and they serve important public interests. The great industries of the country are in a high degree dependent upon the use of these explosives for their successful promotion. It is very important, if not absolutely essential, to employ them in the construction of the great tunnels, subways, aqueducts, and canals which are so vital to the commercial development and welfare of the country. Congress has recognized the necessity for their transportation as legitimate articles of commerce by providing proper regulations therefor.

The testimony showed that the dynamite shipped was what was known as 75 per cent. gelatine dynamite; that it was manufactured in the proper way, and packed in boxes in the usual manner in cartons with proper parchment paper in the boxes and sawdust in the bottom; that no instance had been reported where gelatine dynamite had ever leaked through the box; that gelatine dynamite is less sensitive to shock than nitroglycerine dynamite; that all dynamite is exploded by concussion; that it may be exploded by fire, but is more readily exploded by concussion than by spark; that powder is exploded by a spark, and that on the morning of the explosion, and prior to putting on board the dynamite, there had been placed on the Katherine W. 100 barrels of black blasting powder; that it would require great concussion to set off gelatine dynamite.

The testimony also showed that the Katherine W. was used exclusively to transport high explosives around New York; ships not being allowed to take on board explosives at any of the docks in Manhattan Island and city of New York. The transfer of explosives to ships for export had to be made at Gravesend Bay. The mode employed to transfer the dynamite from the car to the Katherine W. was the usual mode by which such transfers were made. The owner of the boat, the respondent Healing, had been engaged in the transportation of explosives for 25 years and had three boats engaged in the work at the time of ·the explosion. The men employed on the boat were experienced men and accustomed to handling high explosives. And Healing testified that during the whole 25 years he had been engaged he had never before had an explosion. Healing hired and paid and controlled his men, and they were subject to his exclusive orders. They were frequently assisted in loading and unloading by the men connected with the powder company or with the boats of the company.

The station and freight agent at Kenville, who had been employed there for 25 years, and during that time had been receiving shipments of explosives, testified that he had never had an accident there; that more than 15,000,000 pounds of dynamite were shipped from that station a year; that from one to ten cars a day were loaded there with dynamite each day in the week except Sundays and Saturdays; that 3,000 boxes of dynamite on the average were shipped a day; that the cars were loaded by the men belonging to the powder company; that car 91,442 was loaded in exactly the same way the cars were usually loaded; that the car after it was loaded was examined by the inspectors and found all right; that the boxes shipped on the car 91,-442 were marked "High explosives Dangerous" and "This side up." Two other cars were loaded at the same time, one containing 783 boxes of dynamite and the other 40 cases. It was conceded the cars were properly loaded and placarded.

The explosion occurred a short time after the work of transferring the dynamite from the car to the lighter commenced. All the men who had been at work in the car, alongside the plank or upon the lighter, were killed. A large part of the dynamite was in the car and in possession of the railroad company at the time of the explosion. Some portion had been removed and was alleged to have been in the possession of the powder company through the medium of its agent Healing, who had been employed by it to load it upon the Katherine W.

There is no evidence which shows just what caused the dynamite to explode.

[4] Upon this state of facts the libelants contend that the explosion of the dynamite, while in the custody and possession of the respondents, gives rise to a presumption that the accident was due to their fault, and we are asked to decide the case upon the principle of liability announced in the case of Rylands v. Fletcher, L. R. 330, 339 (1868). It was decided in that case that, if the owner of land brings upon his land anything which would not naturally come upon it and which is in itself dangerous and may become mischievous if not kept under proper control, he will be liable in damages for any mischief thereby occasioned,

even though he may have acted without negligence.   Lord Cranworth stated the principle as follows:

"If a person brings or accumulates on his land anything which, if it should escape, may cause damage to his neighbors, he does so at his peril.  If it does escape and cause damage, he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent the damage."

The doctrine of Rylands v. Fletcher has been the subject of considerable discussion in the state courts, some of which has been favorable and some unfavorable.   The courts in Massachusetts have approved it and followed it in a number of cases.   Wilson v. City of New Bedford, 108 Mass. 261, 11 Am. Rep. 352 (1871); Shipley v. Fifty Associates, 106 Mass. 194, 8 Am. Rep. 318 (1870); Gorham v. Gross, 125 Mass. 232, 28 Am. Rep. 224 (1878).   The Supreme Court of Ohio in Bradford Glycerine Co. v. St. Mary's Woolen Mfg. Co., 60 Ohio St. 560, 54 N. E. 528, 45 L. R. A. 658, 71 Am. St. Rep. 740 (1899), followed it, applying it in an action for damages caused by the explosion of nitroglycerine stored in a magazine.

But the doctrine of Rylands v. Fletcher seems to have been, in this country, quite generally disapproved.   The New York Court of Appeals in 1873 in Losee v. Buchanan, 51 N. Y. 476, 486, 10 Am. Rep. 638 declined to follow it, and asserted that the English doctrine was "in direct conflict with the law as settled in this country."   In this country it has been held in numerous cases that if one builds a dam upon his own premises, and thus holds back and accumulates the water for his benefit, or if he brings water upon his premises into a reservoir, and the dam or the banks of the reservoir give way, and the lands of his neighbor are flooded, he is not liable for damage without proof of negligence or fault upon his part.   And if one builds a fire upon his own premises, and it escapes upon his neighbor's premises, and damage results, the one who built the fire is not, under a number of decisions in the state courts, liable without proof of negligence.

In Brown v. Collins, 53 N. H. 442, 16 Am. Rep. 372 (1873), the New Hampshire court considered at length Rylands v. Fletcher, and traced the origin of the doctrine announced in that case to principles introduced in England at an immature stage of English jurisprudence and an undeveloped state of agriculture, manufacture, and commerce. The court then said:

"At all events, whatever may be said of the origin of those rules, to extend them, as they were extended in Rylands v. Fletcher, seems to us contrary to the analogies and the general principles of the common law, as now established.   To extend them to the present case would be contrary to American authority, as well as to our understanding of legal principles."

In Marshall v. Welwood, 38 N. J. Law, 339, 20 Am. Rep. 394 (1876), the Supreme Court of New Jersey in an opinion by Chief Justice Beasley considers at some length the English doctrine and says that it "is clearly opposed to the course which judicial opinion has taken in this country."   The court held the doctrine not applicable to the facts of that case and decided that the owner of a steam boiler which he had in use on his own property was not responsible, in the absence of negligence for the damage done by its bursting.   In 1906 the doctrine

was again repudiated in New Jersey by the equity court, Vice Chancellor Garrison saying that the maintenance of the doctrine in its vigor "would have practically stopped all progress." O'Hara v. Nelson, 71 N. J. Eq. 161, 168, 63 Atl. 836.

The Supreme Court of Pennsylvania in Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, 150, 6 Atl. 453, 460, 57 Am. St. Rep. 445 (1886), said:

"The doctrine declared in Rylands v. Fletcher, regarded as a general statement of the law, is perhaps not open to criticism in England, but it is subject to many and obvious exceptions there and has not been generally received in this country. A rule which casts upon an innocent person the responsibility of an insurer is a hard one at the best, and will not be generally applied unless required by some public policy, or the contract of the parties."

The general and fundamental rule is that, in order to sustain an action for a tort, the damage complained of must come from a wrongful act. In Addison on Torts, vol. 1, p. 3, the law is stated as follows:

"A man may, however, sustain grievous damage at the hands of another, and yet if it be the result of inevitable accident, or a lawful act, done in a lawful manner without any carelessness or negligence, there is no legal injury and no tort giving rise to an action for damages."

We are unable to discover that either the railroad company or the powder company or the contractor Healing, or any of the employés of either, committed any wrongful act which caused this explosion.

[5] At the time of the explosion the dynamite was in the course of transportation. A common carrier must transport freight of this character over its line, and the doctrine of Rylands v. Fletcher, if applicable at all, cannot be applied to cases of this nature. We think there can be no doubt, so far as a common carrier is concerned, that such danger as necessarily results to others from the performance of its duty, without negligence, must be borne by them as an unavoidable incident of the lawful performance of legitimate business. Indeed, in Rylands v. Fletcher the opinion of Blackburn, Judge in the Court of Exchequer Chamber, concedes this, for he says:

"Traffic on the highways, whether by land or sea, cannot be conducted without exposing those whose persons or property are near it to some inevitable risk; and, that being so, those who go on the highway or have their property adjacent to it may well be held to do so subject to their taking upon themselves the risk of injury from that inevitable danger; and persons who by the license of the owner pass near to warehouses where goods are being raised or lowered certainly do so subject to the inevitable risk of accident. In neither case, therefore, can they recover without proof of want of care or skill occasioning the accident."

It certainly would be an extraordinary doctrine for courts of justice to promulgate to say that a common carrier is under legal obligation to transport dynamite and is an insurer against any damage which may result in the course of transportation, even though it has been guilty of no negligence which occasioned the explosion which caused the injury. It is impossible to find any adequate reason for such a principle.

[2] But it was urged upon us in the argument that the facts in the case clearly establish the existence of a nuisance. Car 91,442 had been forwarded on January 24th, and on January 25th the powder company

received notice of its arrival. The next day the powder company removed 200 cases from the car, and placed them on a storage barge which belonged to it, and anchored it down the bay, in accordance with a practice it had followed for ten years. Nothing was done on January 27th to unload the balance of the car. On January 28th there were 170 cases more removed from the car for an export shipment. The remaining 300 cases were to be placed on board a steamer which it had been expected would sail on January 25th, but which was delayed in its sailing. Under the established rules, the explosives could not be placed on board the steamer until her other cargo had been loaded. Then the explosives had to be taken to her on a lighter and put on board at Gravesend Bay. As soon as the steamer was ready to receive the cargo, the unloading of the dynamite remaining in the car commenced.

[3] The mere fact of the accident does not prove the libelant's case under the doctrine of res ipsa loquitur. To make that doctrine applicable, it is necessary that the thing which exploded should have been at the time in the exclusive control of the defendant, who is to be made liable. If a presumption of fault arises from the mere fact of the explosion, whose fault is indicated? It is impossible to say whether the dynamite in the car exploded first and while still in the possession of the railroad company, or whether the dynamite in the boat first exploded and while it was in the possession of Healing or of the powder company. In Wolf v. American Tract Society, 164 N. Y. 30, 58 N. E. 31, 51 L. R. A. 241 (1900), the evidence showed that the injury had been caused by a brick which fell from an upper story of a building in course of construction. There was no proof as to how the brick came to fall. There were 19 different contractors engaged in operations on the building at the time. The plaintiff brought his suit against the owner and two of the leading contractors. The court said:

"We agree with the court below that this is a case where the maxim res ipsa loquitur applies. There is a presumption that the plaintiff's injury was the result of negligence. * * * But that presumption did not complete the proof which it was incumbent upon the plaintiff to make before the case could be submitted to the jury. In a case like this, where the building in process of construction is in charge of numerous contractors and their workmen, each independent of the other, and none of them subject to the control or direction of the other, some proof must be given to enable the jury to point out or identify the author of the wrong."

In the case at bar the libelant claims that the doctrine of res ipsa loquitur applies to all of the respondents and imposed upon each the burden of proving absence of negligence. To make the doctrine apply to each, the dynamite which exploded must have been at the time under the control of all, which manifestly was not the fact. Moreover, to make the doctrine apply to any one of the respondents, it would be necessary that the accident should identify the wrongdoer, and under the facts of this case the wrongdoer is not identified.

In Hardie v. Boland Co., 205 N. Y. 336, 98 N. E. 661 (1912), an action was brought against a contractor for the death of the plaintiff's intestate caused by the collapse of a chimney he was engaged in pointing up; he having been thrown from the scaffold upon which he was

standing and killed. The contractor was erecting the chimney in accordance with plans made by architects who were employed by the owner of the premises. The court held the doctrine of res ipsa loquitur had no application, since the accident did not identify the wrongdoer.

"There were two actors, the architects and the contractor, and the accident may have been due wholly to the negligence of the former. In such a case res ipsa loquitur is inapplicable (Loudoun v. Eighth Avenue R. R. Co., 162 N. Y. 380, 385 [56 N. E. 988]), for the accident does not identify the wrongdoer (Wolf v. American Tract Soc., 164 N. Y. 30 [58 N. E. 31, 51 L. R. A. 241]). If causes other than the negligence of the defendant might have produced the accident, the plaintiffs were bound to exclude the operation of such causes by a fair preponderance of the evidence. Wadsworth v. Boston El. Ry. Co., 182 Mass. 572 [66 N. E. 421]. When either one of two persons, wholly independent of each other, may be responsible for an injury, the case is one for affirmative proof and not for presumption. Harrison v. Sutter Street Ry. Co., 134 Cal. 549 [66 Pac. 787, 55 L. R. A. 608]."

According to the libelant's own theory as presented upon the argument, the accident might have been caused by the negligence of either the railroad company, the powder company, or Healing. It is also true that the explosion may have been caused by the act of outsiders entirely unconnected with any of the respondents. If the explosion itself is evidence of negligence, such negligence may have been that of the powder company in the manufacture of the dynamite or the packing of it in the boxes; or it may have been the negligence of the railroad company in improperly handling the car; or it may have been the negligence of Healing in carelessly transferring the boxes from the car into the lighter; or it may have been the negligence of unauthorized persons who may have interfered with some of these operations. And any one of these theories is almost as probable as another. The cause of the explosion is a mystery and cannot be accounted for.

We are asked to hold the respondents responsible for the damages upon the theory that, even though they were not guilty of negligence, they were guilty of a nuisance in keeping on pier 7 the dynamite which caused the damage. It is true that the common-law liability for a nuisance is not dependent on any theory of negligence. In an action for the creation or maintenance of a nuisance, a recovery cannot be defeated by showing that there is no negligence as the question of negligence is not involved. In 29 Cyc. 1172, it is said:

"The manufacture, storing, or keeping of explosive substances in large quantities in the vicinity of dwelling houses or places of business is ordinarily regarded as a nuisance, whether such business is so or not, being, however, dependent upon the location, the quantity, and the surrounding circumstances."

And the courts have held that no one has a right to erect or maintain a nuisance to the injury of his neighbors, even in the pursuit of a lawful trade. Rodenhauser v. Craven, 141 Pa. 546, 21 Atl. 774, 23 Am. St. Rep. 306 (1891); Pennsylvania R. Co. v. Angel, 41 N. J. Eq. 316, 7 Atl. 432, 56 Am. Rep. 1 (1886); Baxendale v. McMurray, L. R. 2 Ch. 790 (1867). All this we are not disposed to question, but we do not see that the doctrine involved has any application to the facts of the present suit. The inspector of combustibles who had general supervision of the storage of explosives in Jersey City was asked:

"Q. Are you familiar with the different streets and places, the lands and waters within the jurisdiction of Jersey City? A. Yes. Q. You have been all over them time and again? A. Yes. Q. Is there any storehouse or magazine for the storage of explosives maintained in the city of Jersey City? A. No. Q. In your opinion, was the end of pier 7 the proper place for the delivery of explosives from railroad cars to vessels? A. Yes, that it was a proper and the best place around the Central Railroad. Q. Why do you say it was the best place around the Central Railroad? A. Because it was about the furthest point away from any street or any property. Q. What is the nearest street to pier 7? A. Jersey avenue. Q. How far away is Jersey avenue roughly from this pier? A. Close on to about a mile, I believe. Q. If you were asked to name a location for cars containing dynamite or high explosives, railroad cars which had been received over the rails of the Central Railroad of New Jersey, would you consider the end of pier 7 a location which the public interests would demand? A. I would consider that about the best place there is over there."

This pier 7 was used for the shipment of explosives, and the testimony shows that the locality was a suitable one for the purpose. We cannot think that under the circumstances it was an improper place on which to deliver the dynamite. Car load lots of dynamite were always sent to pier 7 to be discharged for the reason that it was more remote than any of the other piers from the general traffic in the yards. So far as the railroad company could do so, it isolated pier 7 from all general traffic. The claim was made that the railroad companies should be required to obtain piers in a more isolated part of the shore of the harbor. In view of the testimony already quoted, to the effect that this location was a mile away from any street, we cannot say that this was an improper place in which to transfer the dynamite from the cars to the lighter.

Then it has been urged upon us that, as the 300 cases of dynamite were allowed to remain in the car for six days, they are to be regarded as having been practically in storage, and that pier 7 was an improper place in which to store so large an amount of explosives. But where should they have been removed to? There was no place in Jersey City for the purpose. And we agree with the court below in its opinion that the dynamite was not being held in storage but was still in course of transportation. The evidence established the fact that, in case of goods intended to be transferred to steamers for shipment to foreign countries, the railroad company usually allowed ten days, free of demurrage, for effecting the transfer, while in the case of goods not intended for export they had to be removed within 48 hours. This difference is due to the fact that explosives cannot be placed down in the hold where the danger would be great and so are taken on board after all other cargo is stowed. This dynamite was to be transferred to the Invernic for transportation to Montevideo. The original intention was that the vessel would sail on January 25th but her departure had been delayed from day to day for reasons not connected with the respondents. Until her cargo was loaded and she was ready to sail, the dynamite could not be placed on board because of the government regulations making it necessary to load the explosives at Gravesend Bay. Under all the circumstances, neither the railroad company nor the powder company nor the respondent Healing was at fault in per-

mitting the dynamite to remain in the car for the six days which elapsed between the arrival of the car and its unloading.

[6] It is claimed that the respondent failed to comply with the requirements of the laws of the state of New Jersey and with the municipal regulations of Jersey City in respect to the storage of explosives. It is sufficient to say that the dynamite which exploded was addressed to Carlisle, Crocker & Co., Montevideo. It was a foreign shipment and as such was subject exclusively to the act of Congress approved March 4, 1909 (35 Stat. 1135, c. 321 [U. S. Comp. St. Supp. 1911, p. 1660]). That act (section 233) authorized the Interstate Commerce Commission to formulate regulations for the safe transportation of explosives which should be binding upon all common carriers engaged in interstate or foreign commerce which transport explosives by land. The Interstate Commerce Commission accordingly formulated and issued regulations governing the transportation of explosives in interstate and foreign commerce. We have no doubt that the dynamite in question was subject exclusively to the regulations of the Interstate Commerce Commission. When Congress has legislated upon a subject within its constitutional control, and has manifested its intention to deal therewith in full, the authority of local jurisdiction is necessarily excluded. See Northern Pacific Railway Co. v. State of Washington, 222 U. S. 370, 378, 32 Sup. Ct. 160, 56 L. Ed. 237.

[7] The captain of the Ingrid had received written instructions on his arrival to place his vessel on the south side of pier 6, and the vessel was so berthed on January 10th, and on January 12th she commenced to discharge her cargo into cars of the railroad company which were on the dock alongside of the ship. On January 13th the captain was informed by a wharfinger in charge of the piers that the vessel would have to shift its berth to the next pier as the space at pier No. 6 was needed for other ships. To this the captain at first replied, "Well, you have put us in a berth for discharging, and I have a right to stay here." He finally said that he had no objection to the ship being moved, but added, "You have to move the ship yourself on your own risk." To this the wharfinger answered, "Oh, yes, we will do that." The captain then instructed the mate that if any one from the railroad company should come to move the ship he could do so, but that "he should tell the man that came with the tug it was on their risk that he did so." The afternoon of that day the ship was moved around to pier 7 by the tugs of the railroad company without expense to the Ingrid. Prior to the explosion no one on board the Ingrid had actual knowledge that any of the cars on pier 7 contained explosives. The evidence shows, however, as we have heretofore stated, that the cars containing dynamite were at all times while on pier 7 placarded with the regular danger placards. The rule is well settled that if a wharfinger knows of the existence of a danger to ships coming alongside his wharf, and permits a vessel to come alongside in ignorance of that danger or obstruction, and without any warning of it, he is liable for any damage to the ship resulting therefrom. The rule was stated by Chief Justice Fuller in Smith v. Burnett, 173 U. S. 430, 433, 19 Sup. Ct. 442, 443, 43 L. Ed. 756 (1899), as follows:

"Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, or to give due notice of its existence to vessels about to use the berths."

This doctrine is clearly applicable to cases where some obstruction concealed and hidden under the water makes it dangerous to approach a wharf or where the wharf is safe at high water but becomes unsafe for vessels of a certain draft at ebb of the tide, from the uneven condition of the bed of the stream or the presence of a concealed rock.  But, as the wharfinger does not guarantee the safety of vessels which come to his wharf, we do not think that the facts in this case are governed by the principle now under consideration.  We cannot say that the railroad company was bound to give actual notice to every vessel berthed at the wharf that cars with dynamite were on the pier.  It is true that dynamite is a dangerous substance because it may be exploded, and, if exploded, the consequences may be most serious.  But in reality the danger of the accidental explosion of dynamite is not great.  Many car loads of it have been handled for years on this pier 7 without accident.  The possible danger from it was not so imminent and so great that it was the duty of the company to warn against its presence every vessel making use of the wharf.  Its explosion was something not to be reasonably expected.  We do not think that the fact that the vessel was moved by the railroad company from pier 6 to pier 7, and that if she had remained at pier 6 she might not have sustained any severe injury, affects in any manner the question of liability.  And the statement that the vessel if changed from pier 6 to pier 7 was to be at the risk of the railroad company related to the danger and expense involved in the act of shifting her and not as to her safety after she was moored to pier 7.  The captain had no reason to suppose that pier 7 was not as safe as pier 6, and neither party at the time had in mind any guaranty of safety from an explosion on pier 7.  It was not within human foresight to foresee that the vessel was not as safe on the south side of pier 7 as on the south side of pier 6.  The difference involved was one of only 40 feet, and at either pier the vessel was within the zone of danger as it turned out, for men and property on pier 6 and even further to the north were seriously injured.

Decree affirmed.