## CITY OF SEATTLE v. LLOYDS' PLATE GLASS INS. CO.*

(Circuit Court of Appeals, Ninth Circuit.   October 7, 1918.)

### No. 3112.

1. EXPLOSIVES ⟐⇒4—SUBJECT OF COMMERCE. ·
    Dynamite, as a legitimate subject of commerce, while in transit to a foreign country, may be lawfully brought into any harbor.
2. COMMERCE ⟐⇒10—CARRIAGE OF EXPLOSIVES—PORT REGULATIONS—NON-EXERCISE OF POWER OF CONGRESS.
    There is nothing in Rev. St. §§ 4278–4280 (Comp. St. 1916, §§ 8016-8018), relating to transportation of nitroglycerin in interstate and foreign commerce, which deprives a city of power to designate places in its harbor where explosives in course of transportation in interstate or foreign commerce shall be handled or kept.
3. MUNICIPAL CORPORATIONS ⟐⇒736 – TORTS—CREATION OF PUBLIC NUISANCE.
    While a municipal corporation is not liable for a mistake in judgment, or even negligence, of its officers in designating a place for the storing of explosives, it has no right to create a public nuisance, and, if it does so, it is liable for the resulting damages.
4. MUNICIPAL CORPORATIONS ⟐⇒849—LIABILITY FOR ACTS OF OFFICERS—CREATION OF PUBLIC NUISANCE.
    A city ordinance, establishing harbor regulations, creating a fairway, and designating a powder dock for use exclusively for handling explosives, construed, and the city *held* liable for damages caused by an explosion of dynamite on a scow which the port warden without authority permitted to anchor in the fairway, where it had remained for 16 days. ·
5. MUNICIPAL CORPORATIONS ⟐⇒741(1)—ACTIONS AGAINST—PRIOR PRESENTATION OF CLAIM.
    Under a statute and ordinance requiring claims against a city to be presented and filed before bringing action thereon, an insurance company which, under the terms of its policies, has replaced glass broken by an explosion charged to have been due to the fault of the city, may properly file claims therefor in its own name.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Action at law by the Lloyds' Plate Glass Insurance Company against the City of Seattle. Judgment for plaintiff, and defendant brings error. Affirmed.

A powder company of San Francisco, Cal., shipped to the Baldwin Shipping Company, at Vladivostok, 15 tons of gelatine dynamite, by a coastwise steamer called Loop, to be transferred at Seattle to one of the Japanese marus for transportation to its destination; the latter ship being expected to sail from Seattle about the time the Loop should arrive. On the arrival of the Loop at Seattle, however, it was found that that Japanese ship could not take

---

the shipment, and it was then arranged to ship the dynamite on the steamship Robert Dollar, which was expected to sail about a week later. For the reasons stated it became necessary to unload the explosive from the Loop, and it was placed on a scow of the Lillico Launch & Tugboat Company, which company was the agent of and acting for the powder company. This scow, with the explosive on board, was, on the 14th day of May, 1915, moored by the launch and tugboat company, without the knowledge of the port warden of the city of Seattle, to buoy No. 1 that the city had erected in the harbor, to await the arrival of the Robert Dollar, which was the next vessel carrying explosives bound for Vladivostok.

The city had, on March 1, 1915, pursuant to authority granted by its charter, enacted an ordinance, sections 7 and 8 of which are as follows:

"Sec. 7. All waters herein specified, subject to reservations for anchorage, shall be known as 'fairway,' and shall not be obstructed in any manner whereby navigation may be endangered or impeded, and shall include, subject to such reservations, the following described waters:

"All of Elliott Bay, lying easterly of a straight line drawn from Alki Point to West Point.

"All of the east and west waterways.

"All of the Duwamish river.

"All of the Duwamish waterway project.

"All of Salmon Bay.

"All of Lake Washington Canal, outside that portion which shall be under the supervision and control of the United States government.

"All of Lake Washington, Lake Union, and Green Lake, lying or being within the corporate limits of the city of Seattle, or within the jurisdiction and control of the city.

"All that portion of Shilshole Bay, lying easterly and southerly of a line from West Point to the intersection of the northerly boundary of the city of Seattle with the outer harbor line.

"All navigable waters in the projection of public streets, lying on the landward side of the outer harbor line, shall be fairway. It shall be unlawful for the master, or other person in charge of any vessel, to anchor, tie, or make fast such vessel in any such fairway for a longer period of time than reasonably sufficient to load or unload the same, except that the port warden may, in his discretion, grant any permit for the use of any such fairway for a longer period of time whenever in his judgment such use will not interfere with the use of the fairway by any other vessel, but only upon the payment of the anchorage charges herein provided for.

"Sec. 8. In aid of commerce and navigation anchorage for vessels is authorized in the following described waters:

"Elliott Bay Anchorage—Beginning at the northeast corner of Harbor Island; thence northerly and in a straight line to a point intersecting a line drawn along the north side of King street; thence west on said line to a point intersecting the east line of the west waterway; thence along said east line to the northwest corner of Harbor Island; also, beginning at a point of intersection of the outer harbor line with a straight line drawn along the west line of the west waterway; thence north to a point intersecting a straight line drawn along the north side of Washington street; thence in a westerly direction to the junction of the outer harbor line and the east side of the West Seattle Ferry dock."

Within that portion of Elliott Bay lying easterly of a straight line drawn from Alki Point to West Point, and within a half-mile from the path of shipping that comes into Seattle Harbor, a like distance from the wharves and docks of the city, and 1,300 feet from a fill in Elliott Bay known as Harbor Island, which at the time here in question was vacant land, the city erected buoy No. 1. The morning after the scow of the Lillico Launch & Tugboat Company, with the dynamite on board, was moored to buoy No. 1, the port warden of the city was notified of the fact, and in consideration of the payment of a fee prescribed by the city ordinance of $1 per day he issued a permit to the launch and tugboat company to so moor the scow, at the time knowing that it had on board the 15 tons of dynamite. The scow so remained moored to that buoy until the dynamite exploded, about 2 o'clock in

the morning of May 30th, resulting in great damage, including the breaking of a large amount of plate glass owned by various persons in the city of Seattle, a part of which glass was insured by policies of insurance issued to such owners by the Lloyds' Plate Glass Insurance Company and the Globe Indemnity Company. Pursuant to the obligations imposed by those policies, the insurance companies mentioned caused the glass to be replaced, and filed claims against the city for the amounts paid by them for the replacing of such glass under their respective policies. Subsequently the Globe Indemnity Company assigned its claim against the city to the Lloyds' Insurance Company, which brought the present action against the city for damages, resulting in findings and judgment for the plaintiff, to review which the city brought the present writ of error.

Hugh M. Caldwell and Frank S. Griffith, both of Seattle, Wash., for plaintiff in error.

Bogle, Graves, Merritt & Bogle, Flick & Paul, and Hughes, McMicken, Ramsey & Rupp, all of Seattle, Wash., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1, 2] It cannot be doubted that the dynamite, being foreign commerce in transit to its place of destination, was rightfully brought into the harbor of Seattle. Such substance has long been a legitimate subject of commerce. Actiesselskabet Ingrid v. Central R. Co. of New Jersey, 216 Fed. 72, 132 C. C. A. 316, L. R. A. 1916B, 716; The Ingrid (D. C.) 195 Fed. 596, and cases there cited. The contention of the appellant that the city was without power to designate the place or places within the harbor where such an explosive should be handled, kept, or stored we are unable to sustain. Neither section 4278 nor 4279 of the Revised Statutes (Comp. St. 1916, §§ 8016, 8017), embodying provisions of the act of Congress of July 3, 1866 (14 Stat. 81, 82, c. 162), nor the decisions of the Supreme Court reported, respectively, in Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, Northern Pac. Ry. Co. v. Washington ex rel. Atkinson, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237, and Southern Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257, in our opinion, sustain it.

It is beyond question that, where Congress has legislated in respect to either foreign or interstate commerce, no state or other subordinate legislation upon the same subject is of any validity. But we find no legislation of Congress with respect to the place or places within any harbor of the United States where any kind of explosives shall be handled, kept, or stored. Section 4278 above cited makes it unlawful to transport, carry, or convey, ship, deliver on board, or cause to be delivered on board, certain specified kinds of explosives, including nitroglycerin, upon or in any vessel or vehicle used or employed in transporting passengers by land or water, between a place in any foreign country and a place within the limits of any state, territory, or district of the United States, or between a place in one state, territory, or district of the United States and a place in any other state, territory or district thereof; and section 4279 of the same Statutes makes it unlawful to ship, send, or for

ward any quantity of such explosives by a vessel or vehicle of any description, by land or water, between a place in a foreign country and a place within the United States, or between a place in one state, territory, or district of the United States, and a place in any other state, territory, or district thereof, unless the same shall be securely inclosed, deposited, or packed in a certain prescribed way; and the next section—4280 (section 8018)—declares that the two preceding sections shall not be so construed as to prevent any state, territory, district, city, or town within the United States from regulating or from prohibiting the traffic in or transportation of those substances between persons or places lying or being within their respective territorial limits, or from prohibiting the introduction thereof into such limits for sale, use, or consumption therein.

In all this we see nothing in any way relating to the place or places in any harbor of the United States where any kind of an explosive in course of foreign or intrastate commerce shall be placed, kept, or stored; and while, as has been said, it is beyond question that where Congress has legislated in respect to either foreign or interstate commerce no state or other subordinate legislation upon the same subject is of any validity, yet we understand the law to be that, where Congress is silent, the state may legislate in aid of, but without burdening, both foreign and interstate commerce. Such we understand to be the effect of the last of the decisions above cited of the Supreme Court, where, at page 436 of 222 U. S., at page 142 of 32 Sup. Ct. (56 L. Ed. 257), the court cited, with apparent approval, its previous decisions in the cases of Atlantic Coast Line R. R. Co. v. Mazursky, 216 U. S. 122, 30 Sup. Ct. 378, 54 L. Ed. 411, and Western Union Tel. Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105, saying, among other things, that—

"In those cases, and in the later case of Western Union Tel. Co. v. Milling Co., 218 U. S. 406 [31 Sup. Ct. 59, 54 L. Ed. 1088, 36 L. R. A. (N. S.) 220, 21 Ann. Cas. 815], the principle is expressed that 'there are many occasions where the police power of the state can be properly exercised to insure a faithful and prompt performance of duty within the limits of the state upon the part of those engaged in interstate commerce.' Such exercise of power, it was further said, was in aid of interstate commerce, and, although incidentally affecting it, did not burden it."

[3] We readily concede that municipal corporations, which are created by the state and invested with certain governmental powers for local purposes and for the public good, are not liable in damages for their failure to so legislate, or for any mistake in judgment in the matter of any such legislation. Decisions to this effect are very numerous. But we think it is clear that such a corporation has no right to create a public nuisance, and that, if it does so, it is liable for the resultant damage. See Bruhnke v. La Crosse, 155 Wis. 485, 144 N. W. 1100, 50 L. R. A. (N. S.) 1147; Fitzgerald v. Town of Sharon, 143 Iowa, 730, 121 N. W. 523; Mayor, etc., v. Furze, 3 Hill (N. Y.) 612; Hughes v. City of Fond du Lac, 73 Wis. 380, 41 N. W. 407; Hart v. Board of Chosen Freeholders of Union County, 57 N. J. Law, 90, 29 Atl. 490.

The cases cited and relied upon by the plaintiff in error, in which it was sought to hold the city of Baltimore liable for damages resulting from an explosion in waters over which it had jurisdiction— Zywicki v. Jos. R. Foard Co. et al. (D. C.) 206 Fed. 975; Jos. R. Foard Co. v. State of Maryland, 219 Fed. 827, 135 C. C. A. 497; Gutowski v. Mayor, etc., of City of Baltimore, 127 Md. 502, 96 Atl. 630—were based upon the alleged negligence of that city in designating the place for the transshipment or keeping of the explosive, or negligence in not properly supervising the handling of it; the Circuit Court of Appeals of the Fourth Circuit saying in the second of the cases last referred to (219 Fed. 834, 135 C. C. A. 504):

"Assertion of liability of the city of Baltimore is made on the ground that it was negligent in designating the place where the accident occurred for the transshipment of dynamite, in that it was a place frequented by other vessels and that it was negligent in not properly supervising the loading of dynamite where an explosion would probably result in loss of life and property. This position is untenable. The general rule is that actionable negligence cannot be imputed to a city for mistake of judgment, or even negligence, of its officers in performing the governmental function of selecting a place for the loading of explosives from which it derives no profit."

And in the case of Gutowski v. Mayor, etc., of Baltimore, 127 Md. 502, 96 Atl. 630, the same obvious distinction was pointed out by the Supreme Court of Maryland, between such cases of negligence or failure on the part of the municipality and such a case as is here complained of, where the complaint in the case, as well as the decision of the court below, are based upon the ground that the defendant city, in authorizing and directing, through its port warden, this dynamite to be placed and kept at its buoy No. 1, created a public nuisance, in violation of its own ordinance designating another and different place for such purpose.

[4] About two months before the occurrences in question, to wit, on the 1st of March, 1915, the city enacted the ordinance referred to in the statement, by which the city, in the exercise of its police power, assumed control and jurisdiction over all navigable waters within its limits, and by which there was, among other things, created the fairway in the waters of the bay that has been described, subject to anchorage, and in which fairway the city subsequently constructed and maintained, among others, anchorage buoy No. 1. The ordinance made it unlawful for any master or person having charge of any vessel to anchor or make the same fast in the waters of the fairway or anchorage without first obtaining a permit therefor from the port warden of the city, and paying certain prescribed anchorage fees therefor; the port warden being thereby given power, and it being made his duty, to remove any vessel from any buoy, wharf, or anchorage for nonpayment of any such prescribed fees. It prohibited every master or other person in charge of any vessel from attaching the same to any city buoy until he should have obtained permission so to do from the port warden, provided that during the night or in bad weather such vessel might be attached to any vacant buoy, with the requirement that the person in charge thereof should notify the port warden not later than 8 o'clock of the next legal day

of such act, stating the name and character of the vessel and the probable length of time it desired to remain at the buoy. It made the port warden the sole judge as to what vessel or vessels should occupy the city buoys, and conferred upon him power to revoke any such permit for a violation of any of its terms. It made various provisions respecting the handling, keeping, and storage of explosives within the harbor, and, among others, these parts of section 38:

"No person shall, on any pier or other structure, except on the powder dock or on powder boats within Seattle Harbor, store or have on hand for sale, or sell, or keep any powder, ignition caps, dynamite, or other like explosives, either by day or night.

"No vessel with a cargo or part cargo of powder, ignition caps, dynamite, or other like explosive arriving at Seattle Harbor, shall lie alongside of or make fast to any pier until the port warden shall have issued a permit so to do. * * * Any person, desiring a permanent berth at the powder dock for the transfer of powder, shall pay to the port warden a minimum charge of twenty-five (25) dollars per month when such vessel does not exceed fifty (50) net tons, which shall allow such vessel to lie thereat and discharge or handle in any one month not over twenty-five (25) tons of explosives over the same. Whenever any vessel shall handle more than twenty-five (25) tons of explosives over such dock in any one month, the regular one (1) dollar per ton rate shall be collected in lieu of such twenty-five (25) dollar rate.

"Every powder boat engaged in the transfer or handling of explosives and lying at the powder dock for such purpose, or for the transfer of explosives direct to vessels on the day of departure, as permitted herein, shall have on board a written permit from the port warden, known as a 'Monthly Powder Permit.' The port warden shall collect two (2) dollars for each monthly powder permit, and the terms of the permit shall comply with the provisions of this ordinance, which permit may be revoked by the port warden for cause without notice. * * *

"Every vessel carrying a cargo of explosives in any form, while lying at anchor, or at a city buoy, or alongside the powder dock, shall at all times, both by day and night, have on board a competent and sufficient crew, which shall at all times display the required signals and be ready to and have authority to immediately move such vessel when emergency requires, or when required by the port warden. * * *

"Every vessel, whether lying at anchor, or at a city buoy, or in any other position within Seattle Harbor, engaged in the transfer of explosives, shall have on board at the time of such transfer a written permit therefor from the port warden, which permit shall state the time and place of such transfer, and the amount of explosives to be handled. * * *"

Section 39 is as follows:

"The Harrison Street municipal pier is hereby designated for use temporarily as a powder dock, and for use exclusively for the handling of powder, dynamite, and other like explosives, and as a place for vessels carrying as cargo or part cargo such explosives. Any vessel shall be allowed to lie at said pier only after a written permit shall have been issued by the port warden."

The ordinance in question is not as clear as it might have been made, and, indeed, is in some respects somewhat perplexing; but we are of the opinion that there is not only nothing in it authorizing the port warden to permit any vessel engaged in transferring dynamite from one vessel to another in the harbor to tie up with it on board to buoy No. 1 in Elliott Bay fairway, but, on the contrary, that there are affirmative and express provisions in the ordinance prohibiting such action, namely, the provisions of section 39, by which the Harrison Street pier was expressly designated "for use

temporarily as a powder dock, and for use exclusively for the handling of powder, dynamite, and other like explosives, and as a place for vessels carrying as cargo, or part cargo, such explosives," and that provision of section 38 expressly declaring that "no person shall on any pier, or other structure, except on the powder dock or on powder boats, within Seattle Harbor, store or have on hand for sale, or sell, or keep any powder, ignition caps, dynamite, or other like explosive, either by day or night."

It is true that the ordinance contains several provisions contemplating the anchoring within the harbor of the city of vessels having on board a cargo or part cargo of dynamite or other explosives, and contemplating the transfer by vessels of all or any of such explosives from one vessel to another within the harbor. Those provisions are the clauses which read:

"Every vessel lying at any powder dock or at anchor within Seattle Harbor, which has a cargo or part cargo of dynamite, ignition caps, blasting or sporting powder, or other high explosive or explosives in any form, shall between sunset and sunrise display" certain signals, and "shall at all times, both by day and night, have on board a competent and sufficient crew which shall at all times display the required signals and be ready to and have authority to immediately move such vessel when emergency requires, or when required by the port warden."

But neither of those provisions, we think, can be properly held to apply to the scow of the Lillico Launch & Tugboat Company, which took on board the 15 tons of dynamite from the ship Loop, and was permitted by the port warden to keep it for 16 days anchored to buoy No. 1 in the Elliott Bay fairway.

[5] The point is made on behalf of the plaintiff in error that the court below erred in admitting in evidence over its objection the claims filed by the insurance companies against the city pursuant to the provision of the city charter and a similar provision of a statute of the state of Washington, providing, as a condition to the bringing of an action against the city for damages, that a claim therefor be presented to the city council and filed with the city clerk. The contention on the part of the city is that such claims should have been filed by the parties whose glass was broken. But we think the conclusive answer is that the glass was at once replaced by the insurance companies pursuant to the provisions of the respective policies, which companies thereupon became subrogated, both by the terms of the policies as well as by the law, to all of the rights of their respective assured, and thenceforth the sole parties in interest.

The case of Haynes v. Seattle, 83 Wash. 51, 145 Pac. 73, said by the plaintiff in error to be "on all fours with the case at bar," we think not at all like the present one, for there a third party filed a claim against the city for the injured person. While the Supreme Court of the state of Washington has in many cases, and always, given effect to the provision of the charter of the city and of the statute, it has uniformly held that its requirements must be reasonable, and that a reasonable compliance with the provision is all that can be demanded. Falldin et al. v. City of Seattle, 50 Wash. 561,

97 Pac. 658; Walters v. Seattle, 97 Wash. 657, 663, 167 Pac. 124. We think there is no merit in the point.

The judgment is affirmed.